566 A.2d 488

**Alonza Kevin BIRCHEAD,**

v.

**STATE of Maryland.**

**No. 48, Sept. Term, 1989.**

Court of Appeals of Maryland.

Dec. 4, 1989.

George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Submitted before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

This case involves convictions of Alonza Birchead by a jury in the Circuit Court for Worcester County upon multiple violations of the controlled dangerous substance laws, Maryland Code (1987 Repl.Vol.), Article 27, §§ 286, 286A, 287 and 290, and of conspiracy to distribute cocaine. Sentences were imposed totalling forty-five years' imprisonment and a $50,000 fine. Upon Birchead's appeal to the Court of Special Appeals, we granted certiorari prior to decision by that court to consider these issues: (1) whether a District Court judge resident in Wicomico County lacked authority to issue a search warrant for execution in Worcester County; (2) whether there was probable cause to support the issuance of the warrants; and (3) whether the evidence was sufficient to support Birchead's convictions.

## I.

Evidence adduced at the trial against Birchead was obtained upon execution of search warrants issued pursuant to an application of two police sergeants (Culver and Bacon), containing these sworn averments: on March 10, 1988, the Salisbury Police Department received a call from an anonymous subject that "a black male wearing a long tan coat and blue jeans was in the parking lot of Grants Shopping Center on Cypress Street, Salisbury, Wicomico County, Maryland, and was in possession of a handgun and was selling crack/cocaine." Acting on the tip, police officers went to this location and observed a man fitting the informant's description; they conducted a pat-down for a weapon, but found none. The suspect was identified by a New York State driver's license as Arthur Lee Gaines.

On March 18, 1988, Salisbury police officers were contacted by a "concerned citizen," who wished to remain anonymous; this informant told the affiant Culver that he had

personal knowledge of a black male, approximately six feet tall from New York, who was known on the street as "New York." The informant said that "New York" was driving a red Chevrolet Nova and was selling cocaine in the Salisbury area, particularly on the parking lot of Grants Shopping Center—an area known by the police for frequent illegal drug transactions.

On March 30, 1988, another "concerned citizen," who also wished to remain anonymous, contacted the Salisbury police with similar information. This informant said that a black male from New York City, named Arthur Gaines, along with a black male known as Alonza Birchead and two black females, Sherry Rideout and Patricia Hunter, had recently returned from New York City with approximately eight ounces of cocaine which they planned to sell in the Salisbury area. The informant also stated Gaines usually drove a red Chevrolet Nova, and that the four subjects were staying at the Days Inn in Salisbury. Later the same day, this informant again contacted the Salisbury police and advised that Gaines, along with Birchead, Rideout and Hunter, were then staying in Room 101 at the Atlantic Budget Inn Motel in Delmar, Maryland. Gaines was then said to be operating a dark grey Ford Tempo, with a Maryland license tag, the number of which the informant disclosed.

Acting on this information, the police ascertained from the management at the motel in Delmar that Room 101 was rented by Gaines, who listed the Ford Tempo on the hotel registration form. The management told the officers that Gaines paid the motel bill one day at a time in cash of one, five and ten dollar bills, and that Room 101 received an "abnormal amount of telephone calls." Cleaning personnel at the motel said that Room 101 had been occupied by two black males and two black females. The Tempo was determined to be owned by a car rental company and was rented by Hunter.

On March 31, 1988, the first "concerned citizen" told the Salisbury police that Gaines, Birchead, Hunter and Rideout

were then staying in Room 207 at the Days Inn Motel in Pocomoke City, Worcester County. The informant also stated that, in addition to the Ford Tempo, another rental vehicle from the same car rental company had been rented by the subjects. The informant further stated that Gaines was then on probation upon drug charges in New York. The Days Inn management confirmed that Room 207 had been rented by Hunter, who also rented Room 119 in the name of Flora Burckhead; that these rooms were occupied by two black males and two black females and paid for in small bills; and that numerous outgoing calls were placed to the Quality Inn Motel in Pocomoke City. Police survey-ing the Days Inn Motel witnessed a Ford Taurus, driven by a black male, arrive on March 31, 1988 and saw the driver enter Room 119. Shortly thereafter, the police observed two black males and two black females leave Room 119. Two of the subjects entered the Tempo and two entered the Taurus; they then drove to the Quality Inn in Pocomoke City where they entered Rooms 102 and 109. Police investi-gation revealed that Room 102 had been rented on March 30, 1988 by Alonza K. Jones, who listed the Ford Taurus on the motel registration form as his vehicle. Police investiga-tion also discovered that this vehicle was rented from a car rental company in Salisbury. Room 109 was rented by Hunter. The two black females left the motel on March 31 in the Ford Tempo and drove to Salisbury, where Hunter exchanged the grey Tempo for a silver-colored Tempo.

On April 4, 1988, the police confirmed that Rooms 102 and 109 at the Quality Inn were still rented to Alonza K. Jones and Hunter. The management also told police that the Taurus and Tempo had been coming and going from the motel during the previous several days. Management also noted that the rooms had been paid for on a daily basis and only in one and five dollar denominations. Police subse-quently discovered that Hunter registered that day in Room 244 at the Days Inn in Pocomoke City. That night police observed two black males and one black female exit Room 244 at the Days Inn and drive to Room 109 at the Quality

Inn where the female entered the room and returned with a black shoulder bag. They returned to Room 244. Police then observed all four subjects exit Room 244, enter the Tempo and travel to the Grants Shopping Center parking lot where three or four black males "conversed with the subjects in the vehicle in a manner indicative of controlled dangerous substance transactions."

The extensive experience and formal training of the two police sergeant affiants in controlled dangerous substance investigations were set forth in considerable detail in their affidavits. They stated that "the parking lot at Grants Shopping Center ... is a known area in which controlled dangerous substance transactions occur frequently," and that "during a recent investigation, over thirty hand to hand purchases of crack/cocaine and other forms of controlled dangerous substances were made by law enforcement officers working in a covert capacity in the Grants parking lot as well as in other nearby areas."

Based on their experience, the affiants related "that it is common practice for subjects involved in the distribution of illegal drugs to utilize motel rooms in order to provide mobility and security from maintaining illegal drugs at their residences"; "that constantly changing rooms, motels, and names used to register is an additional tactic to avoid placing suspicion on themselves and their illegal activity as well as to deter any type of law enforcement investigation into their actions"; that the use and frequent switching of rental vehicles is a popular device among individuals involved in the distribution of controlled dangerous substances to "avoid drawing suspicion to a certain vehicle and to hamper any law enforcement surveillance that may be attempted"; that "it is also common practice for people involved in CDS distribution to rent more than one room at a time in order that the illegal drugs may be stored at one location, while the individuals are actually residing in a second room"; that females are frequently used by drug dealers "to rent vehicles and/or rooms in order to protect their anonymity"; and that it is also a common practice

among drug dealers to pay for motel rooms "one day at a time and to also pay in cash, made up of mostly small bills which are indicative of currency obtained during CDS sales."

The search warrant applications were directed to Richard D. Warren, then a judge of the District Court of Maryland, resident in Wicomico County; they alleged the existence of probable cause to believe that evidence relating to the commission of violations of the controlled dangerous substances law would be found within Room 102 of the Quality Inn Motel and Room 244 of the Days Inn Motel, both located in Worcester County; on the persons of Birchead, Gaines, Rideout and Hunter; and in the rented Tempo and Taurus vehicles. The warrants were issued by Judge Warren and were executed on April 5, 1988 in Worcester County. Numerous bags of cocaine and crack/cocaine totalling approximately fourteen ounces were seized from the rooms and rental cars, together with drug paraphernalia and approximately $19,000 in cash.

## II.

### (A)

Birchead argues that the District Court judge resident in Wicomico County was not authorized to issue search warrants for persons and property beyond his territorial jurisdiction in Worcester County. Consequently, he contends that the warrants were a nullity and the seized evidence must be suppressed. He relies on the holding in *Gattus v. State,* 204 Md. 589, 595, 105 A.2d 661 (1954), that the power of circuit court judges to issue search warrants is limited to the county in which they sit. Birchead contends that this same restriction was made applicable to District Court judges in *State v. Intercontinental, Ltd.,* 302 Md. 132, 486 A.2d 174 (1985).

Unlike the circuit courts of the State, which are nonunified, common law courts of general jurisdiction, with one in each county and in Baltimore City, the District Court of

Maryland is a unified court of limited statutory jurisdiction created in 1970 by Article IV, §§ 1 and 41A of the Constitution of Maryland. Section 41A specifies that the jurisdiction of the District Court shall be uniform throughout the State, as prescribed by statute.[1] Section 41B provides that "[t]he State shall be divided by law into districts," consisting of one county or two or more entire and adjoining counties. This provision also requires that "there shall be at least one District Court Judge resident in each district" and that in any district containing more than one county, "there shall be at least one District Court Judge resident in each county in the district."

Section 1–602 of the Courts and Judicial Proceedings Article, pertaining to the District Court, divides the State into twelve districts "for the purposes of operation and administration." Section 1–603 allocates the total number of District Court judges among the districts and provides in subsection (c) that "there shall be at least one District Court judge resident and holding court in each county in the district." District 2 consists of four counties, including Worcester and Wicomico Counties. Section 4–201 of the Courts Article provides that the District Court's jurisdiction "extends to every case which arises within the State or is subject to the State's judicial power, and which is within the limitations imposed by this title or elsewhere by law." Section 594D(a) of Article 27 authorizes each judge of the District Court to issue warrants "when and in the manner authorized by law." Section 551(a) of Article 27 authorizes a District Court judge, upon probable cause shown, to issue a warrant to search "any individual or in any building, apartment, premises, place or thing *within the territorial jurisdiction of such judge.*" (Emphasis added.)

---

**1.** An exception to the uniformity requirement of § 41A is that "in Montgomery County and other counties and the City of Baltimore, the Court may have such jurisdiction over juvenile causes as is provided by law."

As we said in *State v. Intercontinental, Ltd., supra,* 302 Md. at 136, 486 A.2d 174, a search warrant is in the nature of criminal process; its primary purpose is to aid in the detection and suppression of crime and to obtain evidence for use in criminal prosecution. The issuance of a search warrant is collateral to a criminal prosecution; its execution may or may not result in placing a charge against the individual in whose possession the seized property is found.

It is clear from the Maryland Constitution and the implementing statutes relating to the District Court that it is a single unified court, divided into districts, with statewide uniform jurisdiction. *See Greenbelt Consumer v. Acme Mkts.,* 272 Md. 222, 224, n. 1, 322 A.2d 521 (1974). The geographic division of the District Court into twelve districts, as set forth in § 1–602 of the Courts Article, was solely for purposes of operation and administration; it did not limit the exercise of jurisdiction by a District Court judge to the county or district of residence.[2] Consequently, as the jurisdiction of judges of the District Court is uniform and statewide, we think Judge Warren had "territorial jurisdiction" within the contemplation of Maryland's search warrant statute, § 551(a), to issue a search warrant for execution in any other county of the State.

For the reasons stated, *Gattus v. State, supra,* relating to the power of circuit court judges to issue search warrants, is not dispositive of the authority of District Court judges to issue such warrants.[3] Nor does *State v. Intercontinental, Ltd., supra,* require a different result. The issue in that case was whether Article 551(a) authorized a Maryland judge to issue a warrant to search for evidence that pertained to violations of another state's penal laws. We held that § 551(a) required only that the property to be

---

2. Under § 1–605(c) of the Courts Article, the Chief Judge of the District Court "may assign a judge of the District Court to sit temporarily in a county other than the judge's county of residence."

3. Whether *Gattus v. State, supra,* was correctly decided is a matter which we need not consider today.

seized be located within the territorial jurisdiction of the issuing judge. Nothing in that case suggested that a District Court judge's authority to issue a search warrant was restricted to the county of the judge's residence.

### (B)

Birchead's second contention is that the information received by the affiants from the unidentified informants was insufficient to support probable cause for the warrants. He also suggests that the affiants did not act in good faith in seeking the warrants because they knew nothing of their informants' veracity and basis of knowledge. Additionally, Birchead contends that the police surveillance corroborated only "fairly obvious details" which could not sustain a finding of probable cause.

The federal and state constitutions require that no search warrant shall issue without probable cause. The fourth amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized"; it is applicable to the states by the fourteenth amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *see also Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). Article 26 of the Maryland Constitution is *in pari materia* with the fourth amendment. *Annapolis v. United Food*, 317 Md. 544, 565 A.2d 672 (1989); *Malcolm v. State*, 314 Md. 221, 227, n. 8, 550 A.2d 670 (1988). Probable cause means a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *Malcolm, supra*, 314 Md. at 227, 550 A.2d 670; *Potts v. State*, 300 Md. 567, 572, 479 A.2d 1335 (1984). In determining whether probable cause exists, the issuing judge is confined to the averments contained in the search warrant application. *Valdez v. State*, 300 Md. 160, 168, 476 A.2d 1162 (1984); *Smith v. State*, 191 Md. 329, 335–36, 62 A.2d 287 (1948), *cert. denied*, 336 U.S. 925, 69 S.Ct. 656, 93

L.Ed. 1087 (1949). The judge's task is " 'simply to make a practical, common-sense decision' " whether probable cause exists, *Potts, supra,* 300 Md. at 572, 479 A.2d 1335, quoting *Gates, supra,* 462 U.S. at 238, 103 S.Ct. at 2332; however, "his action cannot be a mere ratification of the bare conclusions of others." *Gates, supra,* 462 U.S. at 239, 103 S.Ct. at 2333.

Our review of the judge's decision to issue the search warrants is limited to whether there was a substantial basis for concluding that the evidence sought would be discovered in the place described in the application for the warrant. *Potts, supra,* 300 Md. at 571, 575, 479 A.2d 1335. Moreover, we generally pay great deference to a magistrate's determination of probable cause. *Malcolm, supra,* 314 Md. at 229, 550 A.2d 670; *Potts, supra,* 300 Md. at 572–73, 575, 479 A.2d 1335; *see also Valdez, supra,* 300 Md. at 169, 476 A.2d 1162 (if in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants, citing *Jones v. United States,* 362 U.S. 257, 270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960) and *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965)). To the same effect, *see Winters v. State,* 301 Md. 214, 228, 482 A.2d 886 (1984).

Whether information in the affidavit provided by an unidentified informant supports a finding of probable cause depends on a practical, nontechnical "totality of the circumstances" approach that considers the informant's veracity or reliability and basis of knowledge. *Gates, supra,* 462 U.S. at 233, 103 S.Ct. at 2329; *see also Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984). In *Potts,* we adopted the "totality of the circumstances" analysis of *Gates,* which departed from the stringent two-pronged test of *Aquilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), both cases

requiring an individual assessment of credibility of an informant's statement for purposes of determining probable cause.

When considering an informant's veracity and basis of knowledge, *Gates* held that "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." 462 U.S. at 233, 103 S.Ct. at 2329. One factor given great weight in *Gates* was the corroboration of details of an informant's tip by independent police investigation. *Id.* at 241–44, 103 S.Ct. at 2333–35. As noted in *Malcolm, supra,* 314 Md. at 231–32, 550 A.2d 670, the relevant facts in *Gates* were as follows:

"There, an anonymous informant notified the police that a certain couple would be trafficking drugs. In addition to providing their names and Illinois address, the informant said the wife would drive to Florida on May 3, drop off the car to be filled with drugs and then fly back to Chicago. The husband would fly to Florida to pick up the car and drive it to Chicago. Police corroboration indicated that 1) the couple lived at a different address than the informant had given, 2) the husband flew to West Palm Beach on May 5, and (3) he *and* his wife started back for Chicago the next day. *Gates,* 462 U.S. at 225–27 [103 S.Ct. at 2325–26]. This information was sufficient to obtain a valid search search warrant for the couple's home and car." (Citation omitted.)

In *Gates,* the Court stated that

"innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens' demands.... In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* at 243–44 n. 13, 103 S.Ct. at 2335 n. 13.

In the present case, the informants' information precipitated an independent police surveillance of the subjects. Indeed, when observed by police officers experienced in the surveillance of illegal drug activity, the actions of Birchead and his companions strongly indicated to the trained officers that the subjects were probably involved in a plan to distribute illegal drugs in the area. In this regard, of course, considerable credit can be given to the expertise of law enforcement officers in conducting investigations into illegal drug activity. *Winters v. State, supra,* 301 Md. at 228, 482 A.2d 886, and cases there cited; *see also Shrout v. State,* 238 Md. 170, 176, 208 A.2d 585 (1965); *Dean v. State,* 205 Md. 274, 283–84, 107 A.2d 88 (1954); *Bratburd v. State,* 193 Md. 352, 356, 66 A.2d 792 (1949).

That the police concluded that the probability existed that illegal drug activity was ongoing in this case was hardly unreasonable when considering the observations made by the affiants, as detailed in their affidavits, *i.e.,* that drug dealers commonly use and frequently change motel rooms and rental cars to discourage police surveillance and enhance mobility; rent more than one motel room at a time in order to store illegal drugs in one room while residing in another; pay for the rentals one day at a time and in small bills obtained from drug sales; and use females to rent vehicles and motel rooms to protect their anonymity. Additional support comes from the observed meeting of the subjects with suspected drug buyers in the Grants Shopping Center—an area where police recently had made over thirty purchases of crack/cocaine and other controlled dangerous substances. That the police confirmed that two of the suspects had been charged in the past with possession of a controlled dangerous substance (one with intent to distribute) was a factor to be taken into account in applying the "totality of the circumstances" formulated in *Gates.*

With regard to the basis of knowledge of the informants, *i.e.,* how they discovered the information conveyed to police, was not known. But the police corroborated their information except for the assertion that the subjects were actually

selling cocaine. The information from each informant was "in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *See Spinelli v. United States, supra,* 393 U.S. at 416, 89 S.Ct. at 589. The informants supplied details of the subjects' recent movements between motels and one informant had knowledge of the criminal background of one subject. This information would suggest that it was obtained in a reliable manner, *i.e.,* by direct observation and perhaps personal association with the subjects. Moreover, additional credit may be given to the circumstance that the tips from each informant were consistent in detail, and thus supportive to some degree of their reliability.

Giving a "commonsense" reading to the entire affidavit, and affording preference to the fact that the officers obtained search warrants, *see United States v. Ventresca, supra,* 380 U.S. at 108, 85 S.Ct. at 745, and *Winters v. State, supra,* 301 Md. at 228, 482 A.2d 886, we conclude that there was probable cause to believe that illegal drugs would be found in the cars and motel rooms rented under the subjects' names. Consequently, Birchead's motion to suppress for lack of probable cause was properly denied.

### (C)

Birchead contends that the evidence at trial was insufficient to convict him for violating § 286A of Article 27, *i.e.,* of unlawfully bringing into Maryland, on or about April 4, 1988, 461.4 grams of crack/cocaine, a felony. While he acknowledges that he orally admitted to police that he drove to New York City with Hunter and Jerome Journigan to buy 10 ounces of cocaine for distribution in the Wicomico County area, Birchead maintains that his extrajudicial confession is not sufficient in itself to support a conviction. He relies on *Woods v. State,* 315 Md. 591, 615, 556 A.2d 236 (1989), where we recognized that an extrajudicial confession of guilt by a person accused of crime,

unsupported by other evidence, is not sufficient to warrant a conviction.

In his oral confession, Birchead admitted that after picking up the cocaine in New York, he and the others were returning to Maryland on April 4, 1988 when he was stopped for speeding in New Jersey and received a warning ticket. The ticket, issued in Birchead's name, was found in the pocket of a jacket during the subsequent police search of the Ford Tempo; the vehicle also contained a smoking device and a suitcase belonging to Birchead. The police search of the Ford Taurus, which Birchead had earlier been observed driving, also contained a plastic baggy containing 2.9 grams of cocaine and a glass smoking device. This was the vehicle that four days before the search was used by Birchead and his companions to drive from the Days Inn to the Quality Inn, where he rented a room in the name of Alonza Jones and identified the Taurus as his vehicle on the motel registration form.[4] It was from this location that Birchead on April 4, 1988, the day he returned from New York, drove with Gaines and the two female subjects to Grants Shopping Center, where they were observed to converse with three or four persons in a manner believed to be indicative of an ongoing illegal drug transaction. Also significant is the fact that earlier on April 4 Birchead was observed leaving Room 244 at the Days Inn with Gaines and others; a significant portion of the cocaine was seized the following day from this location.[5] Indeed, approximately 1.7 grams of loose cocaine was in plain view on top of the television in that room. A metal smoking screen, a metal sifter with a screen, a butane hand torch and a box of razor blades were also in plain view in the room. On the floor near the sink were weighing scales. On top of the counter

---

**4.** Evidence at the trial disclosed that Alonza Jones was, in fact, Alonza Birchead.

**5.** Police testified to discovering 328.9 grams of cocaine and crack/cocaine in various containers hidden from view, the street value of which amounted to roughly $29,000 to $36,000.

near the sink in a white plastic bag was a box of baking soda and a bottle of Inositol powder, commonly used as an agent to prepare cocaine for distribution. A clear baggy containing 25 grams of cocaine was located at the end of the television counter in plain view. Birchead's wallet was found next to the metal sifter, the hand torch and the box of razor blades. Police testimony indicated that the subjects returned to Room 244 the day before the search, and Birchead did not leave that room until he was in custody of police following the search and subsequent arrests more than ten hours later. A search of Room 109 at the Quality Inn, rented by either Gaines or Hunter, produced numerous bags of crack/cocaine and cocaine (more than 64 grams) in addition to $17,563 in cash.

The warning ticket and the concerted movements of Birchead, Gaines and Hunter corroborated the details of Birchead's confession that he, Gaines, Hunter and Journigan travelled together in a car to New York City and bought 10 ounces of cocaine for distribution in Maryland.

In *Woods v. State, supra,* 315 Md. at 615–16, 556 A.2d 236, we observed that evidence to support an extrajudicial confession must be independent of it and relate to and tend to establish the corpus delicti, *i.e.,* the facts necessary to show that a crime has been committed. But the independent evidence, we said, need not be full and complete or establish the truth of the corpus delicti beyond a reasonable doubt or by a preponderance of proof. *Id.* at 616, 556 A.2d 236. It "may be small in amount and is sufficient to establish the corpus delicti 'if when considered in connection with the confession or admission, it satisfies the trier of facts beyond a reasonable doubt that the offense charged was committed and that the accused committed it.' " *Id.,* quoting from *Bradbury v. State,* 233 Md. 421, 424–25, 197 A.2d 126 (1964). And we recognized that the corpus delicti may be proved by circumstantial evidence, and that the accused's identity or criminal agency is not a necessary element of the corroboration required to make the confession admissible. *Id.* We conclude that Birchead's confes-

sion of violating § 286A was amply corroborated and that the evidence was legally sufficient to sustain his conviction of this offense.

■ We next consider the legal sufficiency of the evidence to sustain Birchead's conviction of conspiring with Gaines and Hunter to distribute cocaine. Birchead claims that the evidence was insufficient because the State failed to establish his constructive possession of the "vast bulk" of the cocaine and money found during the search. He acknowledges, however, that the 1.7 grams of loose cocaine, the 25 gram baggy of cocaine and some drug paraphernalia "were in open view and could support the inference of personal use by the five occupants of Room 244."

Birchead argues that the crime of conspiracy to distribute cocaine requires that the accused " 'in order to be found guilty, must know of both the presence and the general character or illicit nature of the substance,' " quoting from *Dawkins v. State,* 313 Md. 638, 651, 547 A.2d 1041 (1988) (holding that knowledge is an element of the offenses of possession of a controlled dangerous substance and possession of controlled paraphernalia). Thus, he says, because there was no showing that he had knowledge of the presence or constructive possession of the large quantity of cocaine or the large amounts of cash in Room 244 as to reasonably indicate an intent to distribute cocaine, he could not be implicated in a conspiracy to distribute cocaine.

As we explained in *Gardner v. State,* 286 Md. 520, 523–24, 408 A.2d 1317 (1979):

"The crime of conspiracy requires 'a combination of two or more persons, [who] by some concerted action [seek] to accomplish some criminal or unlawful purpose; or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means.' *Lanasa v. State,* 109 Md. 602, 607, 71 A. 1058 (1909); *State v. Buchanan,* 5 H. & J. 259 (1821).... The crime is complete without any overt act and may be proved by circumstances giving rise to an inference of common design.

The gravamen of the crime is the illegal scheme or design harbored by at least two persons."

See also Mason v. State, 302 Md. 434, 444, 488 A.2d 955 (1985) and cases cited.

That Birchead's knowledge of the illegality of the transaction may be proved by circumstantial evidence, and inferences properly drawn therefrom, is clear. Dawkins v. State, supra, 313 Md. at 651, 547 A.2d 1041. In addition to the previously mentioned evidence, additional evidence, both circumstantial and direct, was produced that supported the inference that Birchead was working in concert with Gaines and Hunter to distribute cocaine in Maryland. Approximately a week before the search, and up to the day of the search, Birchead rented Room 102 at the Quality Inn where a money safe and two weighing scales were found. A combination to the safe was found in Room 244 in the Days Inn, rented by Hunter. At trial, Hunter claimed ownership of all the cocaine, crack/cocaine and paraphernalia. She testified to her intent to distribute the drugs that week in the Grants Shopping Center. She also testified that she and Birchead were life-long friends, that they used drugs together on occasions and that on the morning of the search they were using cocaine together. Birchead testified to these same facts. Both verified that they were together three or four days preceding the search and that both were in Room 244 the morning of the search.

Taken together, such evidence corroborated Birchead's confession of their plan to distribute cocaine in Maryland, and is sufficient for a jury to infer that between Birchead, Gaines and Hunter, there was a "meeting of the minds reflecting a unity of purpose and design" to distribute cocaine in Maryland. See Mason v. State, supra, 302 Md. at 444, 488 A.2d 955. Thus, Birchead's conviction of conspiracy to distribute cocaine must be sustained. Moreover, Birchead's conviction for the substantive offense of possession of cocaine with intent to distribute was supported by the abundant evidence of his complicity in this offense adduced at the trial.

As to the legal sufficiency of Birchead's convictions for possession of cocaine and possession of drug paraphernalia, there was evidence at trial that placed Birchead in Room 244 several hours before and during the execution of the search. At that time, 1.7 grams of loose cocaine, a 25 gram baggy of cocaine and some drug paraphernalia were in plain view in the room. Birchead, in fact, concedes that these items "were in open view and could support the inference of personal use by the five occupants of Room 244." Birchead also testified that he was using cocaine in Room 244 that morning. This evidence is sufficient for a jury to find he was in possession, *i.e.*, "the exercise of actual or constructive dominion or control over a thing by one or more persons." *See* Code, Article 27, § 277(s); *Dawkins v. State, supra; State v. Leach*, 296 Md. 591, 463 A.2d 872 (1983).

JUDGMENTS AFFIRMED, WITH COSTS.