768 A.2d 150

**Tyrone Antonio WEST**

v.

**STATE of Maryland.**

**No. 663, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

March 7, 2001.

316

James K. Smith (Student Attorney/Rule 16) (Stephen E. Harris, Public Defender and Bradford C. Peabody, Assistant Public Defender, on the brief), Baltimore, for appellant.

Jason F. Trumpbour, Staff Attorney (J. Joseph Curran, Jr., Attorney General, Gary E. Bair, Assistant Attorney General and Patricia Jessamy, State's Attorney for Baltimore City, on the brief), Baltimore, for appellee.

Argued before JAMES R. EYLER, CHARLES E. MOYLAN, Jr. (Ret'd, Specially Assigned) and RAYMOND G. THIEME, Jr. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, Jr., Judge, Retired, Specially Assigned.

We are once again called upon to weigh, along that often enigmatic continuum we refer to as probable cause, the objectives of crime prevention and law enforcement against the individual protections provided to us through the guarantees of the Fourth Amendment.

A jury for the Circuit Court for Baltimore City convicted appellant Tyrone Antonio West of possession with intent to distribute cocaine, possession of cocaine, and possession of marijuana. West was sentenced to twenty years' imprisonment, the first ten years without parole, and to a concurrent term of one year. West appeals his convictions and presents the following questions for our review:

1. Did the trial court err in denying the motion to suppress the items seized from appellant's apartment?

2. Was the evidence sufficient to sustain appellant's convictions?

Finding no reversible error, we affirm.

### Facts

At approximately 2:30 p.m. on September 3, 1998, police officers executed at 4416 Marble Hall Road, Apartment 340, in Baltimore City, a search warrant that had been issued on August 21, 1998. As the officers entered the apartment, appellant and another suspect were spotted exiting the apartment through a bathroom window located at the rear of the apartment. Several officers pursued appellant, eventually apprehending him several blocks away, while other officers involved in the execution of the search warrant searched the apartment and discovered the following: a plastic bag containing one hundred vials of a "white rock substance" in a pair of trousers in the bedroom closet; four bags of marijuana in a pair of sneakers above the bed's headboard in the bedroom; a plastic bag containing sixteen vials of a "white rock substance" in the bathroom toilet; two hand-rolled cigarettes containing marijuana on the dining room table; appellant's Identification Card; and a gas and electric bill in appellant's name. Chemical analysis determined that the "white rock substance[s]" contained a cocaine base.

### Discussion

#### I. Motion to Suppress

Appellant contends that the trial court erred by denying his Motion to Suppress the items seized. He argues that "[t]he information supplied in the affidavit to support the issuance of the search warrant was not sufficient to establish probable cause." We begin our analysis by turning to the affidavit that was utilized in obtaining the warrant in issue. It provided:

During the last week of July your affiant received numerous complaints from several different concerned citizens

about the narcotic activity going on inside of 4416 Marble Hall Road apt # 340 by an individual known as Tyrone Antonio West. Your affiant initiated an investigation. Your affiant received several complaints that there was heavy foot traffic into and out of 4416 Marble Hall Road, apt # 340 and that this type of foot traffic is going on during the early hours of the morning between 1:00 a.m.—4:00 a.m. Additional information was received from a different concerned citizen that an individual known as Tyrone West was selling cocaine and crack from his apartment at 4416 Marble Hall Road # 340. During this same time period there were additional compaints [sic] received that an individual known as Tyrone West, who goes by the street name of "James" who lives at 4416 Marble Hall Road, apt # 340 was selling narcotics from his apartment and his vehicle. The complaint also revealed that Tyrone West drives a grey [N]issan, Maryland registration ETA–931.

On 30 July 98 Officer Jon Foote interviewed a concerned citizen in reference to Tyrone West. The information obtained from this individual was that Tyrone West was dealing narcotics from his apartment at 4416 Marble Hall Road apartment # 340 and from his 1985 Nissan, Maryland registration # ETA931. Furthermore, Tyrone West was known to carry and keep a gun in his residence and vehicle. This information was already received by your affiant and was consistent with other numerous complaints. . . .

Additionally, the affidavit contained appellant's arrest record, which indicated that he had been arrested on ten separate occasions between July of 1987 and May of 1998. His last two arrests had been for possession of marijuana in August of 1997 and attempted murder in May of 1998.

We turn to the trial court's findings at the suppression hearing:

The Court has looked on the face of the affidavit and sees that there are at least two officers involved at two different times in obtaining information. There is a reference at the beginning of the affidavit to the last week of July. The

primary affiant, Officer Ahern[,] refers to numerous complaints from several different concerned citizens about narcotic activity. They refer to a specific address and a specific apartment and complain that there is information from different concerned citizens, unnamed that an individual known as Tyrone West was selling cocaine and crack from his apartment at 4416 Marble Hall Road. They refer to a street name or his alleged street name and a vehicle. A second officer interviews a concerned citizen on July 30th, again unnamed and who is reported to have said that Tyrone West was dealing narcotics.

Furthermore, that Tyrone West was known to carry a gun and that this information was consistent with other numerous complaints. The officers corroborated the ownership of the Nissan, corroborate [sic] the Marble Hall Apartment rental complex that Mr. West lived at these specific premises. They checked with the gas and electric company and they learned that there was an existing arrest warrant for assault and hand gun violations as well as according to the information that they corroborated, a previous connection with Mr. West and guns and drugs based on his record. And on the basis of this information, the officers affirm that there was probable cause to believe that there was evidence of a commission of a crime in the application being at these premises. . . .

The Court finds that looking under the totality of the circumstances here and a practical standpoint of what the citizens have said, of what they have identified, the information that has been corroborated as to the Defendant of living, his vehicle, his previous experience with narcotic [sic] in this Court was sufficient under the totality of the circumstances to warrant the issue of the warrant. . . . The Court further finds after reviewing the case of *Miner v. State* that even had the search warrant not been sufficient as the Court has found, the officer[']s objective would have had a reasonable objective basis to execute the warrant and so for those reasons, the Court denies the [motion to suppress].

■ The Fourth Amendment to the Constitution of the United States provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Its counterpart on the state level, Article 26 of the Maryland Declaration of Rights, also requires that no search warrant shall issue without probable cause. Probable cause means a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Birchead v. State,* 317 Md. 691, 700, 566 A.2d 488 (1989).

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.... The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

*Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

*Standard of Review*

■ Our first issue concerns what standard of review should be employed by us to scrutinize the ruling of the suppression hearing judge. The authoritative word on that subject is found in *Gates*, 462 U.S. 213, 103 S.Ct. 2317. Reviewing courts (at the suppression hearing level or at the appellate level) do not undertake *de novo* review of the magistrate's probable cause determination but, rather, pay "great deference" to that determination. *Id.* at 236, 103 S.Ct. 2317; *Ramia v. State*, 57 Md.App. 654, 655, 471 A.2d 1064 (1984). Reflecting a preference for the warrant process, the traditional standard for review of an issuing magistrate's probable cause determination has been that, so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. *Gates*, 462 U.S. at 236, 103 S.Ct. 2317.

■ In determining whether probable cause exists, the issuing judge or magistrate is confined to the averments contained within the four corners of the search warrant application. *Birchead*, 317 Md. at 700, 566 A.2d 488; *Valdez v. State*, 300 Md. 160, 168, 476 A.2d 1162 (1984). Review of the magistrate's decision to issue a search warrant is limited to whether there was a substantial basis for concluding that the evidence sought would be discovered in the place described in the application and its affidavit. *Birchead*, 317 Md. at 701, 566 A.2d 488; *Potts v. State*, 300 Md. 567, 571, 575, 479 A.2d 1335 (1984). "A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner." *Gates*, 462 U.S. at 236, 103 S.Ct. 2317 (citations and internal quotation marks omitted).

In *State v. Amerman*, 84 Md.App. 461, 470, 581 A.2d 19 (1990), we referred to the Supreme Court's decision in *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684

(1965), and pointed out that the Supreme Court had admonished reviewing courts to "call the close plays" in favor of the magistrate's decision to issue the warrant. We quoted the Supreme Court's language in *Ventresca:*

> Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

*Id.* (quoting *Ventresca,* 380 U.S. at 109, 85 S.Ct. 741).

Although the Supreme Court has determined that more than conclusory statements are required in order for an affidavit to be sufficient ground for probable cause, it has stated that a flexible, common-sense standard best serves the purposes of the Fourth Amendment:

> Our earlier cases illustrate the limits beyond which a magistrate may not venture in issuing a warrant. A sworn statement of an affiant that "he has cause to suspect and does believe" that liquor illegally brought into the United States is located on certain premises will not do. *Nathanson v. United States,* 290 U.S. 41 [54 S.Ct. 11, 78 L.Ed. 159] (1933). An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and the wholly conclusory statement at issue in *Nathanson* failed to meet this requirement. An officer's statement that "[affiants] have received reliable information from a credible person and do believe" that heroin is stored in a home, is likewise inadequate. *Aguilar v. Texas,* 378 U.S. 108 [84 S.Ct. 1509, 12 L.Ed.2d 723] (1964). As in *Nathanson,* this is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause. Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued.

But when we move beyond the "bare bones" affidavits present in cases such as *Nathanson* and *Aguilar*, this area simply does not lend itself to a prescribed set of rules.... Instead, [a] flexible, common-sense standard better serves the purposes of the Fourth Amendment's probable-cause requirement.

*Gates*, 462 U.S. at 239, 103 S.Ct. 2317.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

In *Massachusetts v. Upton*, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), the Supreme Court upbraided the Supreme Judicial Court of Massachusetts for having been too demanding in its scrutiny of the magistrate's decision. It reiterated what *Gates* had said about the appropriate standard of review, making it very clear that finding a substantial basis for what the magistrate did is something less than finding the existence of probable cause: "We also emphasized that the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Upton*, 466 U.S. at 728, 104 S.Ct. 2085. The *Upton* Court reiterated the significant conceptual difference between the two standards:

The Supreme Judicial Court also erred in failing to grant any deference to the decision of the Magistrate to issue a warrant. Instead of merely deciding whether the evidence viewed as a whole provided a "substantial basis" for the Magistrate's finding of probable cause, the court conducted

a *de novo* probable-cause determination. We rejected just such after-the-fact, *de novo* scrutiny in *Gates.*

*Upton,* 466 U.S. at 732–33, 104 S.Ct. 2085.

In *Potts,* 300 Md. at 572, 479 A.2d 1335, the Court of Appeals, speaking through Chief Judge Robert C. Murphy, explicitly adopted the Supreme Court's holdings as to the appropriate standard of review. "After-the-fact judicial scrutiny of the affidavit should not take the form of *de novo* review." *Id.* It concluded:

> Under the totality of the circumstances analysis explicated by *Gates* and *Upton,* and giving the magistrate's determination the great deference mandated by those cases, we hold that there was a substantial basis upon which the magistrate could have found that a search of Potts' residence would uncover illegal narcotics; hence, the issuance of the warrant did not violate the Fourth Amendment.

*Id.* at 575, 479 A.2d 1335.

In *Birchead,* 317 Md. at 701, 566 A.2d 488, the Court of Appeals, again speaking through Chief Judge Murphy, emphatically reconfirmed this deferential standard for reviewing a magistrate's probable cause determination:

> Our review of the judge's decision to issue the search warrants is limited to whether there was a substantial basis for concluding that the evidence sought would be discovered in the place described in the application for the warrant. Moreover, we generally pay great deference to a magistrate's determination of probable cause.

*Id.* (citation omitted). *See also Malcolm v. State,* 314 Md. 221, 229, 550 A.2d 670 (1988) ("[T]he defendant must overcome the presumption of regularity attending a search warrant."); *Thompson v. State,* 62 Md.App. 190, 206–07, 488 A.2d 995 (1985). The "substantial basis" standard is less demanding than even the familiar "clearly erroneous" standard by which appellate courts review judicial fact-finding in a trial setting. *Amerman,* 84 Md.App. at 472, 581 A.2d 19; *see Upton,* 466 U.S. at 733, 104 S.Ct. 2085 ("A deferential standard of review is appropriate to further the Fourth Amendment's strong

preference *for searches conducted pursuant to a warrant.*");
*Potts,* 300 Md. at 575, 479 A.2d 1335 (noting that a magistrate's determination of probable cause should be accorded great judicial deference); 300 Md. at 169–70, 476 A.2d 1162 (noting that Maryland will not construe warrants in a hyper-technical manner, but instead give them the benefit of the doubt).

We remain mindful of our language in *Ramia* pertaining to the appropriate standard of review:

> *Illinois v. Gates* [, *supra,*] leaves no room for doubt that reviewing courts, at the appellate level or at the suppression hearing level, have no business second-guessing the probable cause determinations of warrant-issuing magistrates by way of *de novo* determinations of their own. Unless the finding of the magistrate in this regard is "clearly erroneous" or represents "a clear abuse of discretion," it is unassailable.

*Ramia,* 57 Md.App. at 660, 471 A.2d 1064.

Equally mindful are we of our wording on this issue in *Amerman*[1]:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, *including the "veracity" and "basis of knowledge" of persons supplying hearsay information,* there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is

---

1. We reconcile these statements from *Ramia* and *Amerman* by explaining that, should there be a case where the veracity *and* basis of knowledge of informants are not supplied sufficiently to the issuing magistrate, that could be grounds for a finding, notwithstanding the great deference given to the issuing magistrate, that there was not a substantial basis for the magistrate to conclude that probable cause existed. We choose not to refer to the terms "abuse of discretion" or "clearly erroneous," as we think that reference to a "lack of a substantial basis for the magistrate to conclude that probable cause existed" is more in line with the cases on this point. We shall soon point out that one does not have to look far to find such a case—the present one exemplifies such a finding.

simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Amerman,* 84 Md.App. at 469, 581 A.2d 19 (quoting *Gates,* 462 U.S. at 238–39, 103 S.Ct. 2317) (emphasis added).

Using then this deferential standard of review, we turn to the case *sub judice.* Appellant points out several grounds in support of his position that the affidavit was insufficient to establish probable cause to support the issuance of the search warrant. These contentions, which we will discuss in turn, are: 1) the affidavit failed to establish the veracity and/or the basis of knowledge of the concerned citizens identified in the affidavit; 2) there was a lack of corroboration by police of the information that was provided by the concerned citizens; 3) the "staleness" of the information established within the affidavit; and 4) appellant's arrest record, contained within the affidavit, is remote and insufficient to contribute to probable cause. Although we reject appellant's contentions regarding staleness and the remoteness of his arrest record, we are obliged to agree with his claims regarding the veracity and/or basis of knowledge of the informants and the insufficient police corroboration of their information. We shall discuss each of these points in turn, ultimately holding that there was not a substantial basis for the issuing judge to conclude that probable cause existed, but that the issuance of the warrant withstands scrutiny under the *Leon* good-faith exception to the probable cause requirement, as established by the Supreme Court. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984); *Connelly v. State,* 322 Md. 719, 589 A.2d 958 (1991).

█ The informants' veracity and basis of their knowledge, corroboration by police of information provided by such informants, and whether or not the information contained within the affidavit is "stale" are all factors that determine whether probable cause exists for the issuance of a warrant. While remaining mindful that each factor is but a piece of the

"probable cause puzzle," we will nonetheless address these issues in turn, for the sake of clarity.

### Informants' veracity and basis of knowledge

■ Appellant contends that the affidavit was insufficient to establish probable cause because it failed to establish the veracity and/or the basis of knowledge of the concerned citizens identified in the affidavit.

In the past, the test for probable cause based on an informant's tip consisted of the two-pronged analysis first enunciated in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). There, the Supreme Court required that the police establish 1) the basis of the informant's knowledge and 2) the veracity of the tip, i.e., the credibility of the informant or the reliability of the informant's information. *Id.* at 114, 84 S.Ct. 1509. The Supreme Court also had emphasized that an affidavit must either indicate the manner in which the information was gathered or contain a tip which describes "the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli v. United States*, 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

Occasionally in the law, as elsewhere, there is a house cleaning. Old concepts are discarded or dusted off and refurbished, and space is vacated in order to make room for new theories. Such was the case when it became apparent that the structured nature of these guidelines often undermined law enforcement to an extent greater than the Supreme Court believed necessary. In *Gates*, Justice Rehnquist, writing for the Court, expressed concern over the difficulty faced by non-lawyer magistrates in applying the complex set of analytical and evidentiary rules that had developed under the *Aguilar–Spinelli* test. Reasoning that a less rigid common sense analysis would help alleviate this problem, the Supreme Court abandoned these strict guidelines in favor of a "totality of the

circumstances" approach. *Gates,* 462 U.S. at 238, 103 S.Ct. 2317. *See Winters v. State,* 301 Md. 214, 227, 482 A.2d 886 (1984) (*Gates* replaced the rigid technical analysis of the reliability of informant data in *Aguilar* and *Spinelli* with a more flexible approach).

> This totality-of-the-circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific "tests" be satisfied by every informant's tip. Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a "practical, nontechnical conception." *Brinegar v. United States,* 338 U.S. 160, 176 [69 S.Ct. 1302, 93 L.Ed. 1879] (1949). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 175 [69 S.Ct. 1302].

*Gates,* 462 U.S. at 230–31, 103 S.Ct. 2317 (footnote omitted).

> Moreover, the "two-pronged test" directs analysis into two largely independent channels—the informant's "veracity" or "reliability" and his "basis of knowledge." There are persuasive arguments against according these two elements such independent status. Instead, they are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.

*Id.* at 233, 103 S.Ct. 2317 (footnotes and citations omitted).

The approach set forth by *Gates* is undoubtedly a more flexible and less demanding one than had been required earlier pursuant to *Aguilar* and *Spinelli.* Even under this more lenient test, we cannot find that the information contained within the affidavit sufficiently indicated the informants' veracity or the basis of their knowledge. Cognizant that, pursuant to the Supreme Court's decision in *Gates,* it is

no longer necessary to establish all of these points independently of one another, we nonetheless remain mindful of our language in *Trussell v. State,* 67 Md.App. 23, 29–30, 506 A.2d 255 (1986):

> A word about *Aguilar* and *Spinelli* is appropriate. As valuable case law, they are not dead. They have simply been reduced from "constitutionally binding" stature to "helpful guidelines" stature. *Illinois v. Gates* determined that it was inappropriate, on the probable cause issue, to insist that the rigorous standards mandated by *Aguilar* and *Spinelli* and their progeny be rigidly applied. The flexibility of the "totality of circumstances" approach was more desirable in assessing these *ex parte* decisions that are but part of the preliminary, investigative process. The analytic framework provided by *Aguilar* and *Spinelli*, however, continues to be of service in helping judges to understand what they should look for as they review a warrant application in the first instance.

The hitch with which we are presented here is that the affidavit does not speak to either of these considerations. There is a deficiency in not just one of these considerations, but in all of them. Thus, the deficiencies are clearly not compensated for in any regard within the affidavit, as there is not only no "strong showing" of any of these considerations; rather, there is essentially "no showing" of any one of these considerations. Moreover, there is certainly no "other indicia of reliability" to otherwise compensate for the lack of information concerning the informants' reliability, credibility, or basis of knowledge.

The affidavit merely mentioned information that had been given to the police by "several different concerned citizens." The affidavit also mentioned that "[a]dditional information was received from a different concerned citizen," and that "Officer Jon Foote *interviewed* a concerned citizen" pertaining to appellant's activities. (Emphasis added.) Although we are cognizant of the fact that the date of this "interview" was stated within the affidavit, we think that use of the term "interview," as opposed to referring to the means of informa-

tion as a mere anonymous telephone call, cannot, on its own, lead us to the inference or conclusion that it was any more reliable than an anonymous telephone call. The affidavit does not explicitly state that this was a face-to-face interview; it is as likely an inference that this interview was actually conducted via telephone. What constitutes an interview as opposed to an anonymous conversation? We would have much less difficulty in applying meaning to the term "interview" had the affidavit mentioned that police knew the identity of the person "interviewed," or even merely that they would know how to locate that person should his information have turned out to be false. We certainly cannot allow semantics to play a part in our decisions to uphold or deny the validity of search warrants, and we challenge issuing judges and suppression hearing judges alike to take notice of this fact; we cannot give more credence to the gathered information merely because the term "interview" is applied.

■ Unquestionably, a police officer attempting to convince a judge to issue a warrant is aware that certain words sound better and are cloaked with more reliability than others. This is a prime example. The affidavit should have indicated more facts relating to this "interview." In order to assign more reliability to it, more information should have been provided regarding this meeting between Officer Jon Foote and the concerned citizen. Where did it take place? Was it actually conducted in person or on the telephone? What made this an interview rather than a mere casual conversation or anonymous telephone call? If the Officer did indeed meet this person face-to-face, why was that not stated in the affidavit? Certainly, additional information can only be helpful when deciding on the issuance of a warrant. In order to assure that the purpose of the Fourth Amendment is upheld, police officers must provide details within affidavits when attempting to acquire search warrants, even if such information would seem to the police officer of trivial consequence at the time.

Additionally, mentioned nowhere within the affidavit is the basis of the concerned citizens' knowledge regarding their

complaints. The affidavit makes no mention of whether these people are speaking from first-hand knowledge received through their own senses or are merely passing on information they heard from others. We have already stated, *supra,* that a magistrate, when issuing a warrant, must be presented with a more substantial reason for relying on information than the mere possibility that information is based on a "casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli,* 393 U.S. at 416, 89 S.Ct. 584. We have noted in the past:

> The basis-of-knowledge prong seeks to avoid the danger that even a reliable informant might be passing on, through the conduit of the police affiant, a bit of barroom gossip or a mere underworld rumor. In probing for a more sure basis of knowledge, we seek some assurance that the informant speaks from personal knowledge, that he is passing along what he perceived with his senses.

*Shoemaker v. State,* 52 Md.App. 463, 470, 451 A.2d 127 (1982).

In this case, the affidavit and application did not contain information tending to show how any of these concerned citizens had learned the information they had supplied to police. In *Amerman,* 84 Md.App. at 494, 581 A.2d 19, unlike in the present case, it was clear that the informant had relied on information based on his own experiences. We upheld the warrant in that case, stating:

> The most direct and damning information in the warrant application was aimed directly at 290 Cape St. John Road. This was the information from the informant himself, whose credibility was verified again and again and who alleged that he purchased large quantities of marijuana from [defendant] on a regular, semi-weekly basis.

*Id.* We also stated in that case:

> The source of information stated that it would purchase a half pound of Marijuana twice a week from Quentin Maddox. The half pound would usually cost $450.00. The source stated that it would telephone Maddox, request the amount, and meet a short time later. The meetings would

usually take place on shopping center parking lots, or at convenience stores. The source stated that Maddox would arrive either in a 1981 Mercedes or a 1987 Nissan truck. The source further stated that Maddox does not like to sell less than half pounds at a time, because he loses money on his investment. The source stated that Maddox was always good for several pounds.

The informant recounted to Detective Brown his knowledge that Maddox's original source of supply had been one James Todd Hibler. The warrant application then pointed out that a series of drug raids on November 2, November 4, and November 7 took James Todd Hibler out of circulation. The further information relayed to Detective Brown by the informant self-evidently related to a time following Hibler's arrest in early November[.]

The source stated that when James Todd Hibler was arrested, Quentin Maddox was able to find another source of marijuana that could supply the same amount, if not more, than James Todd Hibler.

*Amerman,* 84 Md.App. at 477–78, 581 A.2d 19.

Information regarding the informant's veracity, the amount of detail provided by the informant, and police corroboration have all been gathered together in cases in which probable cause existed. When one of these factors was lacking, the others were stronger, so that probable cause could be determined by "the totality of the circumstances." In *Malcolm v. State,* 314 Md. 221, 232, 550 A.2d 670 (1988), the Court of Appeals emphasized that "every aspect of the informant's detailed tip was corroborated prior to the search, with the obvious exception of the drug distribution." *Id.* (Informant indicated that Lewis would travel to Tennessee for a "cook of PCP." The police subsequently observed, among other things, Lewis keeping company with Jeff Malcolm, who had a prior Tennessee address and a history of PCP involvement.); *see Potts,* 300 Md. 567, 479 A.2d 1335 (upholding search warrant based on a reliable informant's tip and police corroboration); *see also Herod v. State,* 311 Md. 288, 295–96, 534 A.2d 362 (1987) (discussing corroboration of informant's tip); *Shrout v.*

*State,* 238 Md. 170, 208 A.2d 585 (1965) (upholding search warrant based on tip of informant and police surveillance corroborating the tip).

The fact that an informant provided police with reliable information in the past has served to establish the informant's reliability in a subsequent case. *See Johnson v. State,* 14 Md.App. 721, 728, 288 A.2d 622 (1972) (affidavit related that the informant had given information and actively participated in investigations resulting in over five narcotic-related arrests and seizures within the preceding six months, which was adequate for the issuing magistrate to conclude that the informant was credible). In the present case, however, nowhere within the affidavit was there mention of a single incident in the past when any of the concerned citizens had provided police with information.

Further, the mere use of the term "concerned citizen" within the affidavit causes us concern. Again we are presented with the use of semantics that potentially could be given greater weight in our analysis than it may deserve. If an individual has taken his or her time to provide the police with information about potential criminal activity, is it not safe to assume that that individual is "concerned" about those particular circumstances? We are not provided with any details that would demonstrate how these citizens were any different from a typical anonymous police informant, nor are we provided with information regarding how they were any more "concerned" than others. Just as the term "interview" should not be loosely applied to denote inferences of reliability, the term "concerned citizen" likewise should not be applied to denote a similar indicia of reliability. It is presumed that a "concerned citizen" would have less reason to be untruthful than would the typical criminal informant. But, we are not given any information about these citizens. It cannot be inferred that they are more reliable than any other anonymous police informants merely because they are referred to as "concerned citizens." In *Trussell,* 67 Md.App. at 31, 506 A.2d 255 we discussed the veracity of the concerned citizens who had

provided police with information. We stressed their reliability, and that they were "not from the criminal milieu."

> The two concerned citizen-informants are both members of the West Riding Community, United States and Maryland citizens, hold full-time jobs, are on the Harford County Voters' Register and do not have any criminal record. Neither of the concerned informants is receiving any compensation or remuneration for this information.

*Id.*

In the present case, however, the affidavit provides no information regarding the concerned citizens; nor does it state any reasons to conclude that the concerned citizens are not from the criminal milieu. The term "concerned citizen" can tend to be quite presumptuous, as it assumes that these people were more truthful than other anonymous police informants simply because they are referred to as "concerned citizens."

Appellant relies on *State v. Lee,* 330 Md. 320, 624 A.2d 492 (1993), a case in which the Court of Appeals reviewed the sufficiency of a search warrant affidavit that had been used to search Lee's mobile home and found that the warrant had not been based on the requisite probable cause. At first glance, *Lee* would appear not to be on point with our facts, because it dealt with the validity of an anticipatory search warrant. The Court found the search and seizure to be invalid because police had "failed to fulfill the condition precedent on which the warrant was made contingent by its own terms." *Id.* at 329, 624 A.2d 492. Nevertheless, the Court did in fact provide guidance we find applicable in the present case, as it also stated that "the application and affidavit failed to establish the requisite probable cause *irrespective* of the anticipated drug purchase arranged by the police." *Id.* at 325–26, 624 A.2d 492 (emphasis added.)

The Court noted that "[w]hether information provided by an unidentified informant supports a finding of probable cause depends on a practical, non-technical 'totality of the circumstances' approach that considers the informant's veracity, reliability, and basis of knowledge." *Lee,* 330 Md. at 326, 624

A.2d 492 (citations omitted). The Court pointed out that "the veracity and basis of knowledge of the informant clearly remain relevant to a probable cause determination," and held that "[t]he affidavit failed entirely to address either factor in the instant case." *Id.* at 327, 624 A.2d 492. In affirming the suppression of the narcotics evidence seized from Lee, the Court noted that the factual predicate set out in the warrant application essentially consisted of a second-hand rumor whereby

> the officer merely recounted information about Lee passed through the informant from his brother. The affidavit did not assert that the informant had previously given police truthful and reliable information about criminal activity. The affidavit did not assert that the informant's brother was truthful and reliable. The affidavit did not explain how the brother obtained the incriminating information about Lee. The affidavit did not describe how the brother concluded he could buy drugs from Lee.

*Id.* at 326–27, 624 A.2d 492.

In the present case, we agree with West that the affidavit failed to detail adequately information pertaining to the veracity of the concerned citizens or their specific basis of knowledge regarding the claims made within the affidavit. We look to *Gates* for the definitive word on this issue: "[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all *highly relevant* in determining the value of his report." 462 U.S. at 230, 103 S.Ct. 2317 (emphasis added).

The Supreme Court noted in *Gates* that "if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary." *Id.* at 233–34, 103 S.Ct. 2317. We cannot, however, conclude that such is the situation in the case *sub judice.* Although several different people gave police information concerning West's criminal activities, the affidavit did not mention what in fact made these individuals "concerned citizens," and there was no definitive statement that

explicitly ruled out that these informants were in fact from the criminal milieu, or whether they were compensated for their information. Further, the mere mention within the affidavit that one of the citizens was actually "interviewed" could lead us to believe that the police could locate that individual and subject him or her to criminal liability if the information turned out to be false. As we have already stated, that is simply not an assumption we can accurately make, as we cannot negate the possibility that the "interview" was conducted on the telephone with an anonymous informant.

### Police Corroboration

Appellant argues that the affidavit contains only a "bare bones" assertion of narcotics activity involving appellant, and that the police did not sufficiently corroborate the information provided by the unidentified "concerned citizens." The corroborative police work in this case mainly consisted of verification of ownership of the automobile in question, verification that West indeed did reside in the apartment in question, minimal information received from several different "concerned citizens," and a check into West's prior arrest record. We find such corroboration insufficient even under the deferential "substantial basis" standard for the issuing judge's decision, when considered in conjunction with the deficiencies regarding the informants' veracity and basis of knowledge.

We note the Supreme Court's language in *Gates*, 462 U.S. at 244 n. 13, 103 S.Ct. 2317: "[I]nnocent behavior frequently will provide the basis for a showing of probable cause.... In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." In *Gates*, police corroboration of seemingly innocent activity, reduced to very specific details, tended to show the informant's reliability. That situation is inapplicable here, for the amount of police corroboration greatly differs between *Gates* and the case at bar.

In *Gates*, a search warrant was issued based on an anonymous letter,[2] coupled with police corroboration of the details within that letter. Police investigation determined that the suspect, Lance Gates, had indeed made a reservation, in accordance with the details of the letter, on a flight to Florida at the same time the letter had predicted. 462 U.S. at 226, 103 S.Ct. 2317. Police surveillance was subsequently conducted on Lance Gates, both in Chicago, where he boarded his flight, and when he arrived in Florida. Through police corroboration, most of the details mentioned in the letter proved to be precisely accurate:

> [Detective] Mader then made arrangements with an agent of the Drug Enforcement Administration for surveillance of the May 5 Eastern Airlines flight. The agent later reported to Mader that Gates had boarded the flight, and that federal agents in Florida had observed him arrive in West Palm Beach and take a taxi to the nearby Holiday Inn. They also reported that Gates went to a room registered to one Susan Gates and that, at 7 o'clock the next morning, Gates and an unidentified woman left the motel in a Mercury bearing Illinois license plates and drove northbound on an interstate highway frequently used by travelers to the Chicago area. In addition, the DEA agent informed Mader that the license

---

**2.** That letter read as follows:

> This letter is to inform you that you have a couple in your town who strictly make their living on selling drugs. They are Sue and Lance Gates, they live on Greenway, off Bloomingdale Rd. in the condominiums. Most of their buys are done in Florida. Sue his wife drives her car to Florida, where she leaves it to be loaded up with drugs, then Lance flys [sic] down and drives it back. Sue flys [sic] back after she drops the car off in Florida. May 3 she is driving down there again and Lance will be flying down in a few days to drive it back. At the time Lance drives the car back he has the trunk loaded with over $100,000 in drugs. Presently they have over $100,000 worth of drugs in their basement.
>
> They brag about the fact they never have to work, and make their entire living on pushers.
>
> I guarantee if you watch them carefully you will make a big catch. They are friends with some big drugs [sic] dealers, who visit their house often.

*Gates,* 462 U.S. at 225, 103 S.Ct. 2317.

plate number on the Mercury was registered to a Hornet station wagon owned by Gates. The agent also advised Mader that the driving time between West Palm Beach and Bloomingdale was approximately 22 to 24 hours.

\* \* \*

At 5:15 a.m. on March 7, only 36 hours after he had flown out of Chicago, Lance Gates, and his wife, returned to their home in Bloomingdale, driving the car in which they had left West Palm Beach some 22 hours earlier. The Bloomingdale police were awaiting them, searched the trunk of the Mercury, and uncovered approximately 350 pounds of marihuana. A search of the Gateses' home revealed marihuana, weapons, and other contraband.

*Id.* at 226–27, 103 S.Ct. 2317.

The Supreme Court explained that the anonymous letter, on its own, would not have been enough to "provide the basis for a magistrate's determination that there was probable cause to believe contraband would be found in the Gateses' car and home." *Id.* at 227, 103 S.Ct. 2317.

The letter provides virtually nothing from which one might conclude that its author is either honest or his information reliable; likewise, the letter gives absolutely no indication of the basis for the writer's predictions regarding the Gateses' criminal activities. Something more was required, then, before a magistrate could conclude that there was probable cause to believe that contraband would be found in the Gateses' home and car.

*Id.* (citation omitted).

The Court stated that the police corroboration that took place, however, applying a totality of the circumstances analysis, constituted the probable cause that was necessary for the issuance of the warrant. "Our decisions applying the totality-of-the-circumstances analysis . . . have consistently recognized the value of corroboration of details of an informant's tip by

independent police work." *Gates,* 462 U.S. at 241, 103 S.Ct. 2317.

Regarding police corroboration, we have articulated:

The case that has become the benchmark for independent corroboration of an informant's story is *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). *Gates* refers to it as "the classic case on the value of corroborative efforts of police officials." 462 U.S. at 242, 103 S.Ct. at 2334. In *Draper,* all of the independent police observations were of innocent facts: 1) Draper matched the informant's description, 2) Draper arrived in Denver on a train from Chicago, 3) Draper's attire and luggage matched the description given by the informant, 4) Draper walked rapidly. As *Gates* observed, "[I]t bears noting that all of the corroborating detail established in *Draper* was of entirely innocent activity...." 462 U.S. at 243 n. 13, 103 S.Ct. at 2335 n. 13. The corroborating detail was held to be enough in *Draper,* and *Draper* has been the benchmark ever since. *Amerman,* 84 Md.App. at 492, 581 A.2d 19.

The *Gates* Court referred to the *Draper* case as the "classic case on the value of corroborative efforts by police officials." *Gates,* 462 U.S. at 242, 103 S.Ct. 2317. In *Draper,* an informant named Hereford had been employed by the Bureau of Narcotics for about six months as a "special employee," providing federal narcotics agents with information regarding narcotics law violations. Hereford was paid small sums of money for this information, and the narcotics agent working on the case stated that he "had always found the information given by Hereford to be accurate and reliable." *Draper,* 358 U.S. at 309, 79 S.Ct. 329. Hereford had informed the narcotics agent that James Draper was peddling narcotics, and that Draper would be bringing back three ounces of heroin by train from Chicago to Denver, either on the morning of the 8th or 9th of September. Hereford also provided a detailed physical description of Draper and of the clothing he would be wearing, and said that he would be carrying a tan zipper bag and would be walking real fast. *Id.*

This information, standing alone, would not have established sufficient grounds for probable cause. On the two mornings mentioned by the informant, however, police conducted surveillance in order to corroborate Hereford's information. On the morning of September 9, the federal narcotics agent and a Denver police officer waited at the Denver Union Station and kept watch over all incoming trains from Chicago.

> [T]hey saw a person, having the exact physical attributes and wearing the precise clothing described by Hereford, alight from an incoming Chicago train and start walking "fast" toward the exit. He was carrying a tan zipper bag in his right hand and the left was thrust in his raincoat pocket.

*Id.* at 309–10, 79 S.Ct. 329. They stopped him and found two envelopes containing heroin on him and a syringe in his bag. *Id.* at 310, 79 S.Ct. 329. Although the informant's basis of knowledge had never been established, it was adequately compensated for by the police corroboration.

The Supreme Court in *Gates* upheld the warrant in question, stating that the showing of probable cause "was fully as compelling as that in *Draper.*" *Gates,* 462 U.S. at 243, 103 S.Ct. 2317. The Court reasoned:

> [T]he judge could rely on the anonymous letter, which had been corroborated in major part by Mader's efforts-just as had occurred in *Draper.* The Supreme Court of Illinois reasoned that *Draper* involved an informant who had given reliable information on previous occasions, while the honesty and reliability of the anonymous informant in this case were unknown to the Bloomingdale police. While this distinction might be an apt one at the time the Police Department received the anonymous letter, it became far less significant after Mader's independent investigative work occurred. The corroboration of the letter's predictions that the Gateses' car would be in Florida, that Lance Gates would fly to Florida in the next day or so, and that he would drive the car north toward Bloomingdale all indicated, albeit not with certainty, that the informant's other assertions also were true. "[Because] an informant is right about some things, he is more probably right about other facts," *Spinelli,* 393

U.S., at 427[, 89 S.Ct. 584] (WHITE, J., concurring)—including the claim regarding the Gateses' illegal activity. This may well not be the type of "reliability" or "veracity" necessary to satisfy some views of the "veracity prong" of *Spinelli*, but we think it suffices for the practical, common-sense judgment called for in making a probable-cause determination. It is enough, for purposes of assessing probable cause, that "[corroboration] through other sources of information reduced the chances of a reckless or prevaricating tale," thus providing "a substantial basis for crediting the hearsay." *Jones v. United States*, 362 U.S.,[ 257] at 269, 271[, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)].

*Gates*, 462 U.S. at 243–45, 103 S.Ct. 2317 (footnote omitted).
[T]he anonymous letter contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. The letterwriter's accurate information as to the travel plans of each of the Gateses was of a character likely obtained only from the Gateses themselves, or from someone familiar with their not entirely ordinary travel plans. If the informant had access to accurate information of this type a magistrate could properly conclude that it was not unlikely that he also had access to reliable information of the Gateses' alleged illegal activities. Of course, the Gateses' travel plans might have been learned from a talkative neighbor or travel agent; under the "two-pronged test" developed from *Spinelli*, the character of the details in the anonymous letter might well not permit a sufficiently clear inference regarding the letterwriter's "basis of knowledge." But, as discussed previously, *supra*, at 235[ ,103 S.Ct. 2317], probable cause does not demand the certainty we associate with formal trials. It is enough that there was a fair probability that the writer of the anonymous letter had obtained his entire story either from the Gateses or someone they trusted. And corroboration of major portions of the letter's predictions provides just this probability. It is apparent, therefore, that the judge issuing the warrant had a "substantial basis for ... [concluding]"

that probable cause to search the Gateses' home and car existed.

*Gates,* 462 U.S. at 245–46, 103 S.Ct. 2317 (footnote omitted).

In *Amerman,* police searched the abandoned trash at the suspect's residence, finding a piece of paper with a phone number that was subsequently traced to an individual who had been recently arrested twice for possession of PCP. Additionally, police corroborated the information provided to them by their informant. He had told police that the suspect's original source of drugs had been arrested and had given police that supplier's name. Police verified that the supplier had indeed recently been arrested during a series of drug raids.

We point out that much less corroboration had actually been necessary in the finding of probable cause in *Amerman* than in the case at bar because, as we have stated, *supra,* the veracity and basis of the informant's knowledge were substantially greater there. In the case at bar, the issuing judge had not been provided with sufficient details regarding either one of those considerations. Subsequently, it was dispositive to the issue of probable cause in the present case for the issuing judge to be provided with *more* evidence of corroboration than was necessary in *Amerman,* in order to make up for the lack of information regarding the other criteria in this determination. *See Amerman,* 84 Md.App. 461, 581 A.2d 19.

In *Malcolm,* 314 Md. at 232, 550 A.2d 670,[3] the informant identified the initial suspect, the suspect's residence, the car used by the suspect, the owner of that car, and the drug connection with Tennessee. The tip checked out in every way. In corroborating the tip, the police observed Malcolm's involvement with other subjects, conducted counter-surveillance activities on the suspects, discovered prior PCP histories for all, as well as a telephone call to a number believed to be that

---

**3.** That case involved a warrantless search of an automobile based on an informant's tip. As it did not involve the review of the issuance of a warrant, it was not subject to the same degree of deference as is the case at bar. Nevertheless, *Malcolm* is helpful in its demonstration of police corroboration in a finding of probable cause.

of another drug-connected individual. The quality of the tip and its corroboration allowed the Court of Appeals to conclude that probable cause existed. *Id.* The Court emphasized several factors leading to its determination that probable cause existed in that case. Among those considerations was the fact that "the suspects engaged in what an officer with fifteen years on the force and six years in a surveillance team believed to be countersurveillance. We have long recognized the importance of police expertise." *Id.* at 233, 550 A.2d 670. The Court of Appeals further noted:

This conclusion is consistent with our own cases finding probable cause under the totality of circumstances test. *See Herod v. State*, 311 Md. 288, 534 A.2d 362 (1987) (where the informant 1) exposed herself to prosecution by giving the tip, 2) explained her motive for giving the tip, and 3) gave information based on personal dealings with the defendant); *Winters v. State*, 301 Md. 214, 482 A.2d 886 (1984) (finding probable cause for a search warrant existed when the detailed tip of an informant had been corroborated by the police and the basis of the informant had been established); *Potts v. State*, 300 Md. 567, 479 A.2d 1335 (1984) (where the confidential informant 1) had proven reliable in the past, 2) gave detailed information and 3) was partially corroborated by police investigation).

*Id.* at 233–34, 550 A.2d 670.

In the case at bar, we find that the police corroboration that took place was simply inadequate, even under the deferential standard of our review. The affidavit mentioned that police were advised that West was dealing drugs from his apartment and from his automobile. The application for the search warrant noted that appellant's apartment is located in a "multi-apartment brick complex." Thus, we are inclined to believe that it would have been rather difficult to conduct surveillance of West's apartment because of the enclosed nature of the building. The police, however, should have attempted other means of surveillance of West or his apartment, even if only in some limited capacity. Additionally, there is no mention of police surveillance of West's vehicle.

Presumably, his vehicle was parked at a place where the police could have conducted surveillance in order to corroborate the fact that West was, in fact, dealing from it. The failure to mention police surveillance of West's vehicle, after they had been informed by concerned citizens that he was dealing drugs from it, certainly carries great weight in our decision that there was not enough corroboration. The failure by police to mention in the affidavit surveillance of West's vehicle demonstrates to us one of two things: Either they never attempted to conduct surveillance of his vehicle, in which case they neglected to use what could have proved to be a great evidence gathering tool in their quest for probable cause, or they did watch his vehicle, but did not include mention of that fact in the affidavit because they observed no evidence of drug activity. Either way, police, while nevertheless acting in good faith in their investigation, failed to corroborate adequately the information regarding West's drug activities from his vehicle. As we see from *Gates* and *Draper*, when details regarding the veracity or basis of knowledge of an informant are not sufficiently provided, police corroboration becomes an integral part of the search for probable cause.

In past cases, police have corroborated information regarding illegal activity by surveillance of not only the suspect himself, but also of the suspect's known visitors and associates. If there was indeed so much heavy foot traffic in and out of West's apartment at odd hours, then police could have followed some of these late-night visitors after they left his apartment in order to determine if these individuals were involved in criminal-like activities. They could have followed them to their homes in order for police to establish their identities, so that their criminal records could be ascertained. Thus, even if it were not possible to conduct direct surveillance on West, observing his visitors and inquiring into their other activities and their criminal records would have provided police with more corroboration. Also, in past cases, pen registers and other telephone surveillance have been carried out in order to further corroborate police suspicions of crimi-

nal activity.   Police, however, did not initiate any sort of telephone record inquiry pertaining to West.

In the case *sub judice*, applying the requisite deferential standard of review to the issuing judge's decision, we nevertheless cannot find a substantial basis for concluding that the evidence sought would have been discovered in the place described in the application and its affidavit, based on our review of the information contained therein.   We base this determination on the inadequate information regarding the informants' veracity and basis of knowledge, along with our finding that the police did not sufficiently corroborate the information they received.   Having so concluded, we will nevertheless address appellant's contentions regarding the staleness of the evidence and the remoteness of his arrest record.[4]

### Staleness

Appellant contends that "[t]he information provided by the concerned citizens contained in the affidavit does not provide any delineation of time or temporal context of the alleged criminal activity by [a]ppellant and thereby makes that information fatally stale."   It follows that, if the facts set out in the affidavit were indeed "stale" at the time the warrant was issued, the affiant would not have had reasonable grounds for the belief that the law was being violated on the premises to be searched.   The question is what constitutes "stale probable cause."   In *Peterson v. State*, 281 Md. 309, 314, 379 A.2d 164 (1977), the Court of Appeals stated:

> The affidavit for a search warrant on probable cause, based on information and belief, should in some manner, by averment of date or otherwise, show that the event or circumstance constituting probable cause, occurred at the time not so remote from the date of the affidavit as to

---

4.   We address these issues not merely for the sake of completeness;  our discussion regarding staleness and the remoteness of appellant's arrest record are significant factors on which we base our determination that the *Leon* good-faith exception applies to validate the warrant in this case.

render it improbable that the alleged violation of law authorizing the search was extant at the time the application for the search warrant was made.

*Id.* (citation omitted).

In *Clayton v. State*, 1 Md.App. 500, 503, 231 A.2d 717 (1967), we stated: "There is no statute in this State providing that the facts in the application, set forth to establish probable cause, must result from observations made within a designated time before the issuance of the warrant." We noted that "the remoteness of the facts observed from the date of issuance of the warrant is an element to be considered in each instance by the issuing authority in his determination ... of whether it appears that there is probable cause." *Id.* In *Johnson*, 14 Md.App. at 730, 288 A.2d 622, we applied the guidelines expressed in *Clayton* in holding that a lapse of twenty-six days between the observations of the facts set out in the affidavit and the issuance of the warrant was not so remote as to invalidate the warrant. *Id.* In *State v. Edwards*, 266 Md. 515, 295 A.2d 465 (1972), the Court of Appeals noted "that the very language of an affidavit, while not specifying in so many words an exact date or time, when taken as a whole may be indicative of a present violation." *Id.* at 521, 295 A.2d 465.

In *Andresen v. State*, 24 Md.App. 128, 331 A.2d 78 (1975), we explicated the general rule regarding stale probable cause recognized in *Clayton*, discussed in *Johnson*, applied in *Washburn*, and implied in *Edwards*:

The ultimate criterion in determining the degree of evaporation of probable cause, however, is not case law but reason. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana

cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed.

*Andresen*, 24 Md.App. at 172, 331 A.2d 78.

■ There is no "bright-line" rule for determining the "staleness" of probable cause; rather, it depends upon the circumstances of each case, as related in the affidavit for the warrant. *See, e.g., United States v. Hernandez–Escarsega*, 886 F.2d 1560 (9th Cir.1989) (probable cause not stale when last event occurred almost one year before the warrant issued, but there was evidence of protracted criminal activity); *United States v. Craig*, 861 F.2d 818 (5th Cir.1988) (when affidavit described criminal activity of long standing, information need not be regarded as stale even if fairly long periods of time have elapsed between information and the issuance of the warrant).

■ In the present case, the criminal activity was regenerating, the criminal entrenched, and the items to be seized, while easily transferable, were just as easily replaced. Thus, the probable cause was not stale. The affidavit mentions investigation taking place at the end of July, and the warrant was issued one month later. That the investigation was of an ongoing criminal activity rather than of a random criminal episode is a significant factor in the staleness equation. "A body of criminality in motion will continue in motion in the same direction unless acted upon by a force." *Amerman*, 84 Md.App. at 479, 581 A.2d 19.

When the affidavit is tested and interpreted in a common-sense and realistic fashion, the determination of probable cause in this case hinges not on whether the probable cause was "stale," but, rather, due to the insufficiency of information and lack of police corroboration regarding the informants' veracity and basis of their knowledge. The information pertained to events alleged to have been existing at a time not so remote from the date of the affidavit as to render it improba-

ble that the alleged violation of the law authorizing the search was extant at the time the application for the search warrant was made. We think that it is proper to determine that the affiant, in preparing the affidavit and relating her investigatory information, was describing a continuing criminal enterprise, ongoing at the time of the application, and thus the probable cause relied upon, regardless of whether it was sufficient, was not stale. *Connelly,* 322 Md. at 734, 589 A.2d 958.[5]

### Remoteness of arrests

We turn to appellant's last suggestion regarding the insufficiency of the affidavit—that his arrest record, contained within the affidavit, is remote and insufficient to contribute to a probable cause determination. We disagree.

In support of this assertion, appellant focuses on his arrest for possession with intent to distribute cocaine, stating that his "nine-year-old conviction for possession with intent to distribute is too remote and tenuous to contribute to the establishment of probable cause." Appellant conveniently fails to mention another, more recent, arrest on August 7, 1997, for possession of marijuana. That arrest took place only one year prior to the date of the issuance of the warrant in this case, on August 21, 1998.

Although appellant attempts to disown this arrest, as he fails to even make mention of it in his appeal, we cannot

---

**5.** In *Connelly v. State,* 82 Md.App. 358, 571 A.2d 881 (1990), we had found that the warrant was invalid due to staleness, but remanded to the trial court for a determination of whether the officers had used good-faith in their application for the warrant. We stated that there was "no indication in the affidavit what police investigative activity, if any, occurred between the original surveillance operation, which supposedly began in February, and the application made nine months later in November of 1988." *Id.* at 365, 571 A.2d 881. The Court of Appeals ultimately validated the warrant, applying the *Leon* good-faith exception, irrespective of the arguable staleness. *Connelly v. State,* 322 Md. 719, 589 A.2d 958 (1991). The Court noted that "considerations of staleness of probable cause turn on the circumstances of each particular case, and reasonable minds may differ as to the correct determination." *Id.* at 735, 589 A.2d 958.

likewise disregard it. We think that a one-year-old arrest is certainly not remote. According to the warrant, listed among the items to be seized were "narcotics" and "controlled dangerous substances." There was no specific mention as to what types of illegal drugs police would be searching for; marijuana was clearly one of the types of drugs included in the warrant, and, consequently, West's recent arrest for possession of marijuana was certainly relevant in the totality of circumstances surrounding the issuance of the warrant. Furthermore, not only arrests denoting distribution of drugs were relevant in this case—the warrant listed illegal drugs as an item to be sought; quantities were insignificant in this respect. Therefore, an arrest for possession was arguably as relevant as one for distribution. His arrest for possession of marijuana, in conjunction with handgun violations in 1991 and 1992,[6] and numerous other arrests within approximately the ten years preceding the issuance of the warrant, were clearly relevant to the probable cause determination in this case.

In dealing simply with charges at some time "in the past," the Court of Appeals pointed out, in *Birchead,* 317 Md. at 703, 566 A.2d 488: "That the police confirmed that two of the suspects *had been charged in the past* with possession of a controlled dangerous substance (one with intent to distribute) was a factor to be taken into account in applying the 'totality of the circumstances' formulated in Gates." (Emphasis supplied.)

The Supreme Court case law makes it clear that not only prior convictions but also prior arrests and even a criminal reputation may be significant factors in the probable cause equation. In *Brinegar v. United States,* 338 U.S. 160, 162, 69 S.Ct. 1302, 1304, 93 L.Ed. 1879 (1949), *rehearing denied,* 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949), probable cause to believe that Brinegar was illegally transporting liquor was based in part upon the fact that five months

---

**6.** Also listed as items to be seized were "weapons." The affidavit noted that West had a pending arrest warrant that had been issued on August 13, 1998, for charges of assault and handgun violations.

earlier Brinegar had been arrested for a similar offense and that Brinegar had "a reputation for hauling liquor." In *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), a factor in the accumulation of probable cause of bootlegging was the police observation of two of the suspects selling bootleg liquor three months earlier.

*Amerman,* 84 Md.App. at 484, 581 A.2d 19.

### *Leon good-faith exception*

■■■ We find that the warrant was not issued upon a substantial basis of probable cause. We do find, however, that the *Leon* good-faith exception applies as to the requisite probable cause, as set forth by the Supreme Court in *Leon.* We quote the Court of Appeals, in *Connelly* in its summation of the *Leon* good-faith exception:

In *United States v. Leon, supra,* 468 U.S. at 914, 104 S.Ct. at 3416, the Court explained that because reasonable minds may differ as to whether a particular affidavit establishes probable cause, the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination. Citing the *Franks[ v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)] case, the Court stated that the deference accorded to a magistrate's determination of probable cause "is not boundless . . . . " It observed that reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause; that sufficient information must be presented to the magistrate to allow that official to determine probable cause; and the magistrate's action cannot be a mere ratification of the bare conclusions of others. *Id.* at 915, 104 S.Ct. at 3416.

The Court emphasized that "the exclusionary rule was designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916, 104 S.Ct. at 3417. It said that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclu-

sion will further the purposes of the exclusionary rule." *Id.* at 918, 104 S.Ct. at 3418. In this regard, the Court questioned whether the exclusionary rule has a deterrent effect when the offending officers "acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Id.*

As to the standard of reasonableness, the Court determined that it was an objective, rather than a subjective one, and required that "officers have a reasonable knowledge of what the law prohibits." *Id.* at 919 n. 20, 104 S.Ct. at 3419 n. 20. Thus, where the officers' conduct is objectively reasonable, the Court said that excluding the evidence would not further the ends of the exclusionary rule in any appreciable way. This is particularly true, the Court said, when an officer acting with objective good faith has obtained a search warrant and acted within its scope. *Id.* at 920, 104 S.Ct. at 3419. The Court explained that it is the magistrate's responsibility to establish whether the officer's allegations established probable cause, and accordingly an officer cannot be expected to question the magistrate's probable cause determination, or his judgment that the warrant is otherwise technically sufficient. *Id.* at 921, 104 S.Ct. at 3419. Nevertheless, the Court said that because the officer's reliance must be objectively reasonable, there may be cases where the officer "will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23, 104 S.Ct. at 3420.

The Court concluded that suppression was an appropriate remedy (1) if the magistrate, in issuing a warrant, "was misled by information in an affidavit that the affiant knew was false or would have known was false except for a reckless disregard of the truth," or (2) "in cases where the issuing magistrate wholly abandoned his judicial role . . . [so that] no reasonably well trained officer should rely on the warrant," or (3) in cases in which an officer would not "manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,"

or (4) in cases where "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume [the warrant] to be valid." *Id.* at 923, 104 S.Ct. at 3421. Thus, as summarized by the Court, 468 U.S. at 926, 104 S.Ct. at 3422, "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926, 104 S.Ct. at 3422.

In *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), the Court, in commenting upon its holding in *Leon,* said that the issue was whether the officers reasonably believed that the search they conducted was authorized by a valid warrant, namely, "whether there was an objectively reasonable basis for the officers' mistaken belief." 468 U.S. at 988, 104 S.Ct. at 3428. The Court declined to establish a rule that an officer must disbelieve a magistrate who has just advised him, "by word and by action, that the warrant he possesses authorizes him to conduct the search he had requested." *Id.* at 989–90, 104 S.Ct. at 3428. *See also Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

*Connelly,* 322 Md. at 727–30, 589 A.2d 958.

We find that *Leon* applies to the case at bar, and, accordingly, the warrant should be upheld pursuant to *Leon's* good faith exception to the Exclusionary Rule. In *Leon,* the Supreme Court set forth four types of circumstances in *Leon* whereby a warrant would not be upheld and the exclusionary rule would remain appropriate ground for suppression. We note that appellant mentions only one of these four possible exceptions to *Leon,* and argues that it effectively excludes *Leon* from applying in this case. That exception to *Leon* is the one dealing with cases in which an officer would not "manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render

official belief in its existence entirely unreasonable." We find that this exception to *Leon* does not apply to the facts of the present case, and, accordingly, we hold that the *Leon* good-faith exception provides for the warrant in this case to be upheld. Before going further, we point out that we strictly confine our application of *Leon* in this instance to the facts of this particular case.

During the hearing on appellant's Motion to Suppress, the State argued for the application of *Leon* to this case, stating that "the judge issues a warrant and then they execute a warrant based upon the judge's signature or based upon the judge's authorization and that is definitely where we get into good faith...." Appellant, on the other hand, makes the following argument in support of his claim that the *Leon* good-faith exception does not apply:

First, the affidavit completely fails to address the "clearly relevant" veracity and basis of knowledge of the concerned citizens. Second, the police failed to corroborate the significant aspects of the affidavit, and concentrated on activities that could not contribute to the fair probability that contraband would be found at the Appellant's residence. Third, the probable cause, if any ever existed, is stale because the affidavit does not provide any temporal context of the alleged illegal activity. Moreover, the affidavit does not provide information that would allow a reasonable inference as to the time of the alleged criminal activity. Finally, the Appellant's arrest record is too attenuated to be contributory to the establishment of probable cause.

An objectively reasonable police officer would have known that the affidavit in the instant case did not contain probable cause. Additionally, an objectively reasonable police officer would have corroborated the "tips" provided by the concerned citizens by conducting surveillance outside Appellant's residence or would have, at a minimum, observed the activities of the Appellant. In addition, an objectively reasonable officer would have included information in the affidavit pertaining to the reliability and basis of knowledge of the concerned citizens, or in the alternative, substituted

their own direct observations of the alleged criminal activity.

We decline appellant's invitation to search for a three-legged biped. He cannot dismiss the applicability of *Leon* by raising the same contentions on which he relied regarding the invalidity of the warrant due to insufficient probable cause. The points appellant raises regarding *Leon* are the very reasons for which we found that the warrant was based on insufficient probable cause. That is precisely why the *Leon* good-faith exception exists—it is applicable in cases like this where there is not quite enough probable cause to support the issuance of a warrant, but the warrant should nevertheless be upheld because the police officers relied upon it in good faith, pursuant to the standards articulated in *Leon, supra.* We point out to appellant that there would be no need for exceptions to laws if the standards are the same for both the law and its exception.

Police did investigate the information they had been given. They obtained West's arrest record, spoke with citizens about appellant's activities, and verified that he indeed lived in the apartment and owned the vehicle in question. Thus, police did not merely make bare conclusions in this case. We found that there was not a substantial basis for the issuing judge's conclusion of probable cause, not because there was no police investigation or supporting facts showing criminal activity, but, rather, because there was simply not *enough* corroboration or information regarding probable cause. Surely, there was enough information and corroboration, however, to support the police officers' reasonable objective belief that the warrant was validly based on probable cause.

Considerations of probable cause depend on the precise facts of each particular case, and reasonable minds may differ as to the correct determination. Accordingly, applying *Leon's* objective test in this case, we find that the officers, exercising their professional judgment, could have reasonably believed that the statements within the affidavit related sufficient probable cause that the evidence sought would likely be found

at appellant's apartment. *Connelly*, 322 Md. at 735, 589 A.2d 958.

In applying *Leon*, we must bear in mind the euthanasia of pure reason that would result from holding police officers in the field, usually having no legal education besides the one they ostensibly acquire while on duty, to a higher legal standard than we hold the issuing judge himself, who has legal training and has the benefit of an objective and neutral perspective. It is the judge who possesses the legal acumen to objectively analyze the facts and render a decision as to the constitutionality of a search warrant.

The warrant contained enough details to allow the issuing judge to make the determination that there was sufficient probable cause. We further point out that the suppression hearing judge, although using a deferential standard of review, believed the information provided within the affidavit sufficed to establish a substantial basis of probable cause. Further along the chronology of this case, we point out that our determination that there was not a substantial basis of probable cause was arrived at through a great deal of research and analogy, not while on the battlegrounds of crime, but rather from an arguably more serene environment, with more time for ample reflection, and with access to seemingly limitless resources. We certainly cannot hold the police officers in this case to a higher standard than we expect from ourselves or from the judges that became involved in this case prior to our review. *See Herbert v. State*, 136 Md.App. 458, 487–88, 766 A.2d 190 (2001), where Judge Moylan, writing for this court, stated that, "[e]ven when the warrant is bad, the mere exercise of having obtained it will salvage all but the rarest and most outrageous of warranted searches." In the present case, we hold that "the reliance of the executing officers upon the presumptive validity of the warrant ... exempted the search from the sanctions of the Exclusionary Rule." *Trussell*, 67 Md.App. at 29, 506 A.2d 255.

## II. Sufficiency of the Evidence

■ Appellant asserts that the evidence was inadequate to prove a sufficient nexus between himself and the items that

were seized in the apartment. He points out that no narcotics were found on his person and, therefore, claims that a rational inference cannot be drawn that he possessed the controlled dangerous substances. We disagree and hold that the evidence was in fact sufficient to sustain his convictions.

Appellant's claim conveniently ignores the number of different items seized throughout his apartment. *Trussell*, 67 Md. App. at 34, 506 A.2d 255. Likewise, it seemingly discounts the applicable law on the topic, as reiterated by *Folk v. State*, 11 Md.App. 508, 511–12, 275 A.2d 184 (1971):

> It is well-settled that the proscribed possession of marihuana or of narcotic drugs under the Maryland law need not be sole possession. There may be joint possession and joint control in several persons. And the duration of the possession and the quantity possessed are not material, nor is it necessary to prove ownership in the sense of title.

(Citations and internal quotation marks omitted.)

> Nor is it necessary, in order to be found in joint possession of a contraband drug, that the appellant have a "full partnership" in the contraband. It is enough that she controlled so much of it as would be necessary to permit her to take a puff upon a marihuana cigarette.

*Id.* at 512, 275 A.2d 184 (citation omitted). We stated in *Folk* that we have reversed convictions involving joint possession due to

> 1) the lack of proximity between the defendant and the contraband, 2) the fact that the contraband was secreted away in hidden places not shown to be within his gaze or knowledge or in any way under his control, and 3) the lack of evidence from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use of the contraband.

*Id.* at 514, 275 A.2d 184.

A review of the facts of the present case indicates that all three elements of this analysis have in fact been affirmatively established, thus not placing this case in the same breadth as those cases that have been reversed based on insufficiency.

We have reviewed cases in which we have upheld convictions amid claims by appellants that they were not in direct physical possession of the evidence seized, and we find that the present case is in conformity:

> The common thread running through all of these cases affirming joint possession is 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

*Id.* at 518, 275 A.2d 184.

In the case *sub judice*, the evidence of guilt, measured against those criteria, is overwhelming. *Trussell*, 67 Md.App. at 35, 506 A.2d 255. The defendant, when arrested, was not in close proximity with the evidence seized from his apartment. That is only because he fled when police came to his apartment. Certainly, the fact that appellant attempted to escape from police cannot now be used by him as a means of distancing himself from the evidence seized from his apartment. Thus, proximity can certainly be imputed in this case. Likewise, we have no difficulty in drawing a reasonable inference that the contraband was within West's view, or otherwise within his knowledge, under the circumstances of this case. *Folk*, 11 Md.App. at 518, 275 A.2d 184. Evident in this case is West's ownership or possessory right in the apartment where the contraband was found. The documents found during the search were addressed to West at that address. Moreover, we cannot overlook what essentially amounts to West's own admission regarding this point: In West's appeal to this Court, his first argument is titled, "The trial court erred in denying the appellant's Motion to Suppress the items seized at *appellant's residence.*" There was, furthermore, before the fact-finder in this case the presence of abundant circumstances from which a reasonable inference could be drawn that West

was participating with his co-defendant in the mutual use and enjoyment of the contraband found. West's attempt to flee from the premises when the police arrived is quite significant in this regard.

It was the jury's province to decide whether a sufficient nexus existed between appellant and the items seized. The jury believed that there was and returned several convictions against appellant. It suffices to say that we are fully convinced that the admissible evidence adduced at trial either supported a rational inference of, or demonstrated directly or circumstantially, the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of appellant's possession of the evidence seized, and, therefore, of his guilt for the offenses charged. Thus, it was proper for the trial court to submit the case to the jury for its appraisal. *Shoemaker,* 52 Md.App. at 486, 451 A.2d 127; *Metz v. State,* 9 Md.App. 15, 23, 262 A.2d 331 (1970); *Williams v. State,* 5 Md.App. 450, 459, 247 A.2d 731 (1968).

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**