REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0146

September Term, 2015

_____

SHAUN D. LINDSEY

v.

STATE OF MARYLAND

_____

Krauser, C.J.,
Hotten,
Berger,

JJ.

_____

Opinion by Hotten, J.

_____

Filed:  December 16, 2015

The instant appeal arises from a decision of the Circuit Court for Baltimore County, denying appellant, Shaun Lindsey's motion to suppress information contained in an affidavit, which provided, *inter alia*, the basis for issuing a search warrant for his apartment. Appellant was charged by indictment with three counts of narcotics law violations, (Md. Code (2002, 2013 Repl. Vol.) § 5-612 of the Criminal Law Article ("Crim. Law"), Crim. Law, § 5-602(2), and Crim. Law, § 5-601), as a result of the large amounts of heroin and drug paraphernalia discovered in his apartment. Thereafter, appellant filed a motion for an evidentiary hearing to suppress information contained in the affidavit. Following a two-day motions hearing, the motion was denied. Appellant subsequently entered a conditional guilty plea pursuant to Md. Rule 4-242(d)(2) and received a ten-year sentence without parole. This appeal followed.

Appellant presents one question for our review, which has been divided into subparts as follows:

1. Did the [circuit] court err in denying [appellant's] Motion to Suppress?

   A. By trespassing onto the curtilage of [appellant's] apartment to have a [K-9] dog investigate the contents of his apartment[,] did police violate [appellant's] Fourth Amendment rights[?]

   B. Did [appellant] have a reasonable expectation of privacy in the curtilage around his apartment door?

   C. Did the affidavit in support of the search warrant contain misleading factual information as well as uncorroborated information provided by a confidential source not shown to be reliable?

   D. After redacting all of the unlawfully obtained information from the warrant application, did probable cause to search [appellant's] apartment exist?

For the reasons that follow, we shall affirm the decision of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 26, 2013, the circuit court issued a search and seizure warrant for appellant's apartment located in Cockeysville, Maryland, in response to an affidavit authored by Baltimore City Police Officer, Jai Etwaroo ("Officer Etwaroo"). The affidavit was largely predicated on information received from confidential informants,[1] who alleged that heroin was located in appellant's apartment, as well as information provided by an acquaintance of appellant, Anthony Thomas Hall ("Mr. Hall"), regarding appellant's alleged drug-related activities. The affidavit also included information discovered through an on-going police investigation, in which appellant was an alleged target.

Members of the Baltimore County Police Department's Narcotics Unit, in conjunction with the Baltimore City Police Department's Northeast District Operation Unit/Flex, executed the search warrant for appellant's apartment. The search was initiated by a positive alert received from a K-9 dog in the area in front of appellant's apartment door. Upon entry, detectives encountered appellant in the hallway of his apartment and subsequently discovered large amounts of heroin and drug paraphernalia within the apartment.

---

[1] The parties concede that during the November 2014 motions hearing, Officer Etwaroo confirmed that there were actually two informants who supplied the information contained in the affidavit. Our review of the record suggests that one informant supplied Officer Etwaroo with information in May 2013, and the other, in August 2013. For purposes of clarity, the informants will be referred to as "informant # 1" and "informant # 2," respectively.

On September 16, 2013, appellant was indicted for possession of a large quantity of heroin, possession with intent to distribute, and possession of heroin, in violation of Crim. Law, §§ 5-612, 5-602(2), and 5-601. On December 23, 2013, appellant filed a motion requesting an evidentiary hearing to determine whether the search warrant was supported by probable cause. A two-day motions hearing was held before the circuit court on November 3 and 5, 2014. Officer Etwaroo testified on behalf of the State. Appellant, Mr. Hall, and Stephen Andersen ("Mr. Andersen"), a licensed private investigator and former Maryland State Police officer hired by appellant's counsel, were witnesses for the defense.

Officer Etwaroo testified regarding a conversation that he had with Mr. Hall shortly after his arrest on June 4, 2013, in which Mr. Hall disclosed the alleged drug-related activities of appellant,[2] the information provided by the confidential informants, the events that occurred prior to obtaining a search warrant, and the manner in which the warrant was executed. During Mr. Hall's testimony, he recanted the statements allegedly made during his conversation with Officer Etwaroo. Mr. Hall denied ever speaking to Officer Etwaroo after his arrest on June 4th and stated that several references in the affidavit were not true. Mr. Hall also pointed to several inaccuracies contained in the affidavit regarding his arrest

---

[2] Officer Etwaroo testified that the conversation between the two began when Mr. Hall stated to him, "I know you from somewhere." Officer Etwaroo revealed that shortly thereafter, he initiated a conversation with Mr. Hall about appellant, as follows:

And, so, we were talking, casually, and I was, like, you know, we're only here 'cause of [appellant], you know? And he's like, [ ], [appellant]. And I'm, like, well, put us onto [appellant], and we'll leave you alone. So he began to talk[] [about appellant, relative to the information recited in Officer Etwaroo's affidavit].

for an unrelated charge. However, the circuit court concluded that Mr. Hall's contentions were not credible.[3]

Mr. Andersen testified regarding the security features of appellant's apartment building. Mr. Andersen also recounted that during an interview with Mr. Hall, he denied ever speaking with Officer Etwaroo. The contents of the interview were subsequently memorialized in a ten-page affidavit written by Mr. Andersen and signed by Mr. Hall.

On November 5th, after considering the evidence and testimony of the witnesses, the judge denied appellant's motion to suppress. Thereafter, appellant entered a conditional guilty plea[4] to the count of possession with intent to distribute heroin (Crim.

---

[3] The court concluded:

> But contrast, Mr. Hall contradicted himself on the stand a few times. First, he was ready to admit, yes, I wrote that [ten-page affidavit]. Then, oh, no, no, no, I didn't write all [ten] pages; I just signed the bottom. His story changed a bit on the stand. He did adopt the, I think, . . . the Investigator's version of events. The Investigator wrote the affidavit for him, and that may have been by necessity given Mr. Hall's current [imprisonment]. But at either rate, I did find [Officer Etwaroo] to be a more credible witness than Mr. Hall.
>
> I believe that Mr. Hall spoke to [Officer Etwaroo], and that [he] used that information in his application for the warrant. . . . So, combining that with what I found to be Mr. Hall's kind of incredible recanting of what is in the warrant, I'm denying [appellant's] motions [ ] — to suppress in this case.

[4] Pursuant to Md. Rule 4-242(d)(2), "[w]ith the consent of the court and the State, a defendant may enter a conditional plea of guilty. The plea shall be in writing and, . . . the defendant may reserve the right to appeal one or more issues specified in the plea that (A) were raised by and determined adversely to the defendant, and, (B) if determined in the defendant's favor would have been dispositive of the case. The right to appeal under this subsection is limited to those pretrial issues litigated in the circuit court and set forth in writing in the plea."

Law, § 5-602(2)).  On March 2, 2015, appellant was sentenced to a ten-year term of incarceration without parole and granted an appeal bond.  Appellant noted a timely appeal to this Court.

Additional facts shall be provided, *infra*, to the extent they prove relevant in addressing the issues presented.

## STANDARD OF REVIEW

In *Carter v. State*, 178 Md. App. 400, 408-09 (2008), this Court articulated the standard followed by a judge issuing a warrant and the standard of review exercised by an appellate court reviewing the same.  We opined:

> Our review of the judge's decision to issue the search warrant[ ] is limited to whether there was a substantial basis for concluding that the evidence sought would be discovered in the place described in the application for the warrant.  The substantial basis standard involves something less than finding the existence of probable cause, and is less demanding than even the familiar 'clearly erroneous' standard by which appellate courts review judicial fact finding in a trial setting.  Furthermore, [t]he judge's determination that probable cause exists is entitled to great deference.  The issuing judge's probable cause determination is a practical, common-sense decision based on analyzing the affidavit in light of the totality of the circumstances. [Thus,] [an] after-the-fact scrutiny by an appellate court regarding the sufficiency of an affidavit should not take the form of *de novo* review.  A [warrant-issuing judge's] determination of probable cause should be paid great deference by reviewing courts.  Doubtful or marginal cases should be resolved in favor of the judge's decision to issue the warrant.

(internal citations and citation omitted).

Moreover, when reviewing the denial of a motion to suppress evidence, "we confine ourselves to what occurred at the suppression hearing.  We view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion, here, the State."  *Gonzalez v. State*, 429 Md. 632, 647

(2012) (citation omitted). Furthermore, "[w]e extend great deference to the findings of the motions court as to first-level findings of fact and as to the credibility of witnesses, unless those findings are clearly erroneous." *Brown v. State*, 397 Md. 89, 98 (2007) (citation omitted). "The [court's] legal conclusions, however, are not afforded deference, and are reviewed *de novo*." *Swift v. State*, 393 Md. 139, 155 (2006) (citations omitted).

## DISCUSSION

### I. Substantial Basis for Probable Cause

Appellant contends that the affidavit in support of the search warrant contained misleading factual information, as well as uncorroborated information provided by a confidential source that was not shown to be reliable. Appellant relies on *State v. Lee*, 330 Md. 320 (1993) and asserts that "[t]he *Lee* case is particularly instructive with regard to [appellant's] case" because the affidavit in both cases failed to establish the confidential source's basis of knowledge, veracity, or reliability. However, appellant's reliance on *Lee* is misplaced.

"Whether information provided by an unidentified informant supports a finding of probable cause depends on a practical, non-technical 'totality of the circumstances' approach that considers the informant's veracity, reliability, and basis of knowledge." *Lee*, 330 Md. at 326 (citations omitted); *accord West v. State*, 137 Md. App. 314, 329 (2001). *See generally, Illinois v. Gates*, 462 U.S. 213, 233 (1983). Appellant failed to demonstrate that under the totality of the circumstances, the informants' basis of knowledge, veracity, or reliability was lacking.

The affidavit in *Lee*, 330 Md. at 323, stated, in part:

Frederick Roy Lee reportedly lived in a mobile home on Route 3, Pine Hollow Road, in Rawlings; 2) a confidential informant, or C.I. # 18–2970, had that day informed the police that Lee possessed the illegal drug LSD; 3) the informant stated that Lee 'is supposedly receiving' more of the drug on the same day; 4) '[t]his C.I. is aware of Freddy Lee being in possession of LSD th[r]ough another individual [the informant's brother] who has indicated that he can purchase LSD for the C.I.'; 5) the confidential informant would arrange to have this 'unwitting' individual purchase LSD from Lee at about 11:30 p.m. that evening; 6) Lee had been convicted of possession of marijuana with intent to distribute in September 1988; and 7) the Cumberland City Police Department had received two anonymous reports in October 1991 that Lee was involved in the distribution of LSD.

In support of its conclusion that there was no substantial basis for probable cause based upon the information contained in the affidavit, the Court of Appeals in *Lee*, observed:

Taking all of the circumstances into account, and with due deference to the issuing [judge's] determination, we hold that probable cause did not exist to search Lee's mobile home. The factual predicate set out in [the] application for a warrant, to which we must confine our review, consisted essentially of a second-hand rumor: the officer merely recounted information about Lee passed through the informant from his brother. The affidavit did not assert that the informant had previously given police truthful and reliable information about criminal activity. The affidavit did not assert that the informant's brother was truthful and reliable. The affidavit did not explain how the brother obtained the incriminating information about Lee. The affidavit did not describe how the brother concluded he could buy drugs from Lee. . . . The affidavit failed entirely to address either factor in the instant case.

*Id*. at 326-27.

The circumstances of *Lee* are inapposite to the case before us. First, the initial information supplied by informant # 1 was not predicated on second-hand knowledge. The affidavit stated:

- 7 -

During the month of May, 2013[,] your affiant, BPD members, *received information from a confidential source* about black males known as APPLE and [appellant] who sell large amounts of heroin and/or cocaine throughout Baltimore City. *For the remainder of this affidavit the confidential source will be referred to as [informant # 1]*. [Informant # 1] explained that APPLE drove a white in color Lexus and lived on St. George's Avenue by Woodbourne Avenue.

(emphasis added). Thus, unlike *Lee*, where the affidavit consisted of essentially second-hand rumor recounting information about Lee passed through the informant from his brother, the affidavit in the instant case consisted of information directly from the confidential informant. *Cf. West*, 137 Md. App. at 331-32 (stating that the affidavit fails to mention whether the concerned citizens' whose information provided was used in the affidavit, are speaking from first-hand knowledge received through their own sense or merely passing on information they heard from others). Accordingly, appellant's reliance on *West* is also misplaced.

Additionally, unlike the affiant in *Lee*, Officer Etwaroo demonstrated that informant # 1 had previously provided truthful and reliable information, and also explained how the incriminating information was obtained. As the State noted, "[t]he warrant-issuing judge knew from the affidavit that this same confidential informant's tips had already reliably led to [Mr.] Hall's arrest on June 4, 2013." The affidavit stated:

*Information obtained from [informant # 1] and investigation by BPD members [led] to the arrest of [Mr. Hall].*

*On June 4, 2013 at approximately 1115 hrs [Mr. Hall], DOB 1.12.74, AKA "APPLE" was arrested in reference to a Search and Seizure warrant conducted at 4924 St. Georges Avenue Baltimore, Maryland. [Mr. Hall] is a convicted murderer and was in possession of approximately one half kilogram of heroin and approximately $54,000 [ ] U.S. Currency. After being read his Miranda rights, [Mr. Hall] explained to your [a]ffiant that an*

*individual by the name of [appellant] sells a large amount of heroin and cocaine throughout Baltimore City. [Mr. Hall] further explained that [appellant] drives a silver Mercedes Benz in the area of Loch Raven and Joppa Road. [Mr. Hall] advised that [appellant] meets clients off Padonia Road by an apartment complex which is also where he believes [appellant] has an apartment that he uses to store narcotics.* [Appellant] was further identified using police databases as Shaun Donte Lindsey (M/B/DOB 2-19-71). [Appellant] is a known convicted felon with multiple arrests for [controlled dangerous substances]. [Appellant] has an OPEN arrest warrant issued by the District Court of Baltimore City under D130452803. Armed with this information [y]our [a]ffiant began an investigation into [appellant].

(emphasis added).

Recounting information provided during an encounter with informant # 2 in August 2013, the affidavit further stated:

During the middle of August 2013[,] your affiant met with [informant # 2] [ ]. During this meeting we ascertained that [appellant] was now in possession of [a] large amount of heroin and was now about to begin distributing same throughout Baltimore City. [Informant # 2] advised Officers that [appellant] has been laying low (NOT SELLING NARCOTICS) because his best friend APPLE was arrested while in possession of a large amount of heroin. [Informant # 2] explained that [appellant] was laying low because he believed APPLE, . . . was snitching (TELLING LAW ENFORCEMENT INFORMATION) about [appellant's] heroin distribution organization. [Informant # 2] advised that [appellant] knew this to be true because APPLE has a terrible criminal record to include murder and APPLE pled guilty to only five years for this arrest. [Informant # 2] explained that [appellant] believed there was no way APPLE could have only got a five year sentence without his cooperation with Law Enforcement. Due to APPLE'S arrest [informant # 2] advised that [appellant] would run, flee or take off at the first sign of police presence.

Today, August 26[th][,]2013, your affiant received information that [appellant] was heavy and on deck (IN CURRENT POSSESSION OF A LARGE AMOUNT OF NARCOTICS). Your affiant also received information that [appellant] was going to conduct a large narcotics transaction at 7:00 am (August 27, 2013) where the bulk of [appellant's] heroin would be sold to another source. Baltimore City Police learned that [appellant] was currently operating a silver Mercedes Benz with Maryland

registration [ ].  Your affiant was able to locate this vehicle while it was traveling Northbound on Loch Raven crossing Joppa Road.

(emphasis added).

The information supplied by both informants later corroborated with the evidence discovered during execution of the warrant.  The information supplied also coincided with the evidence Officer Etwaroo obtained through police investigation.  In the affidavit, Officer Etwaroo further stated:

> Using police databases, your affiant was able to determine that the Mercedes was registered to Ellen Hinton.  Your affiant knows that drug distributors often utilize vehicles registered in other people's names to avoid being identified by the police.  Your affiant conducted further investigation using police databases and determined that Hinton and [appellant] have both utilized the address of 4617 W. Forest Park MD in the past and now [appellant] was using the address of 10 Queensbridge Court Apt. K., Cockeysville, MD. . . .  This address was given to CBIF by [appellant] on 11/27/2012 when he was last arrested.  This information corroborated information that your affiant received [from Mr. Hall] that [appellant] has an apartment near Padonia Road.

Although there is little evidence in the record establishing the veracity, reliability, and basis of knowledge of informant # 2, this circumstance is not fatal to the sufficiency of the affidavit.  The information supplied by informant # 2 was only *confirmatory* of the information previously supplied by informant # 1 and the information Officer Etwaroo discovered through police investigation.

In light of the foregoing, appellant failed to discredit the informants' veracity, reliability, and basis of knowledge. *See State v. Coley*, 145 Md. App. 502, 531 (2002) (crediting the information contained in the affidavit because "the officers used a 'past,

proven, and reliable' [informant] who proffered direct statements involving [Coley's] [controlled dangerous substance] distribution history and place of residence.").

We also reject appellant's further argument that "[e]very fact [Officer] Etwaroo attributed to the confidential source is nothing more than a conclusory statement." There are few, *if any*, statements in the affidavit that can be considered conclusory. In the affidavit, Officer Etwaroo recounted:

> Using police databases, your affiant was able to determine that the Mercedes was registered to Ellen Hinton. *Your affiant knows that drug distributors often utilize vehicles registered in other people's names to avoid being identified by the police.* . . .
>
> Attempting to further my investigation your affiant followed [appellant's] vehicle onto the ramp leading to interstate 695 Westbound. While following this vehicle it continuously changed speeds and lanes dramatically. *Based upon your affiant's training and expertise and what your affiant learned from veteran officers your affiant believed this vehicle was showing characteristics of an individual who is attempting to detect or observe a follow or tail. Your affiant knows that major narcotic distributors utilize this technique in order to avoid police detection and[/]or rival narcotic distributors attempting to rob them.* . . .
>
> *Your affiant believes that this behavior* [unidentified persons entering the apartment of a suspected narcotic dealer and leaving after only visiting for a few minutes] *is indicative of narcotics trafficking.* . . .

(emphasis added).

Assuming these averments are conclusory, appellant's argument still fails. In *West*, 137 Md. App. at 323-24, this Court analyzed the Fourth Amendment's probable cause requirement relative to conclusory statements contained in an affidavit. In that case, we opined:

Although the Supreme Court has determined that more than conclusory statements are required in order for an affidavit to be sufficient ground for probable cause, it has stated that a flexible, common-sense standard best serves the purposes of the Fourth Amendment. . . .

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same — and so are law enforcement officers. *Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.*

(emphasis added).

Officer Etwaroo's assertions were based upon his training, experience, and expertise with arrests, searches, and seizures relative to violations of narcotics laws, obtained during his tenure as a Baltimore City police officer. *See Agurs v. State*, 415 Md. 62, 88 (2010) (stating that because of the officers' significant training, experience, and expertise, their assertions "drug dealers often store drugs, cash, records, and other evidence of drug law violations in their residences[,]" has significance in determining "whether there is substantial basis to conclude police will actually find evidence at a drug dealer's home."). A common-sense approach in reviewing the affidavit under *West*, reveals that Officer Etwaroo's assertions were reasonable under the circumstances and entitled to deference. *See Coley*, 145 Md. App. at 530-31 (giving deference to officers' assertion that in their experience, persons engaged in drug law violations are likely to store contraband and documents related to drug activity at their residences).

Appellant further avers:

Not once during his surveillance of [appellant] on August 26 did [Officer] Etwaroo witness any illegal behavior. Indeed he testified that '[i]t could be fair to say' that he witnessed no illegal activity.

We are not persuaded. In *Dixon v. State*, 133 Md. App. 654, 695 (2000), this Court opined:

*[P]robable cause in the context of an informant's tip depends on some combination of the substance of the tip and corroborative observation by law enforcement of the suspect's activities, some of which may appear innocent on its face.* In the case of a confidential informant, as opposed to an anonymous one, evidence as to the informant's demonstrated reliability is also vital. *See* [*Illinois v. Gates,* 462 U.S. 213, 244 n. 13 (1983)] (acknowledging that 'innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens[] demands'); *Draper v. United States,* 358 U.S. 307 [ ] (1959); *see also United States v. McCraw,* 920 F.2d 224, 227–28 (4th Cir. 1990) (stating that combination of tips from reliable confidential informant and first-hand corroborative observation of suspicious activity by law enforcement provided probable cause to arrest); *United States v. Shepherd,* 714 F.2d 316, 317 (4th Cir. 1983) (same) [ ]; *Birchead v. State,* 317 Md. 691, 703–04 [ ] (1989) (concluding that search warrant was supported by probable cause when tips from anonymous informants were combined with corroborative observations by police).

(emphasis added).

Accordingly, Officer Etwaroo's testimony that he did not witness any illegal activity during surveillance of appellant, is of no consequence. Appellant further argues:

Not only did [Officer] Etwaroo mislead the issuing judge about the number of confidential sources providing him information, he also [misled] the judge through several material omissions. For instance, the affidavit leads one to believe that [Mr.] Hall, when arrested, voluntarily offered [Officer] Etwaroo information about [appellant] when, in fact, as [Officer] Etwaroo testified, [Mr.] Hall began providing information after [Officer] Etwaroo told him that 'you know [the police] are only here because of [appellant],' and . . . told him to 'put us onto [appellant] and we'll leave you alone.' Had the issuing judge been made aware of the fact that [Mr.] Hall was offered assistance by the

police during his arrest . . . the judge may have found the claimed information provided by [Mr.] Hall was suspect. . . .

Further, [Officer] Etwaroo wrote in his affidavit that 'as of [11:00 p.m.]' [appellant] had not come out of his apartment during the surveillance.[ ] Also included in the affidavit is the fact that the K-9 unit arrived at 10:45 p.m. Yet [Officer] Etwaroo testified that he 'stayed [at the scene] 'til I got relieved about 10 o'clock, to go write [ ] the search warrant.''

Appellant's arguments here are similarly unpersuasive. As the State noted, "[appellant] raised some of these same points in support of his *Franks* claim,[5] but [ ], he has since abandoned that claim on appeal." Thus, appellant's arguments were "pulverized by the [circuit] court's express finding that it credited the officer's testimony precisely because he took responsibility for and explained" the imperfections in the affidavit. We agree.

During the November 2014 motions hearing, the circuit court concluded:

THE COURT: Okay. I did listen very carefully . . . to the testimony, because I felt like it — this case truly came down to it, and I did have to make some credibility assessments. And it really comes down to [Officer Etwaroo] . . . and Mr. Hall. And I do think [Officer Etwaroo] was very honest in that he admitted his warrant was not the most technically perfect warrant it could have been.

---

[5] A *Franks* claim is raised by a defendant who seeks to challenge the sufficiency of the information proffered in an affidavit supporting a search warrant. In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court addressed *Franks'* right to challenge the truthfulness of certain factual statements made in the affidavit supporting the warrant to search his apartment for evidence related to his state conviction for rape, kidnapping, and burglary. In reversing the state supreme court's decision affirming *Franks'* conviction, the Supreme Court held:

Where [a] defendant makes [a] substantial preliminary showing that [a] false statement knowingly and intentionally, or with the reckless disregard for the truth, was included by [the] affiant in [a] search warrant affidavit, and if [an] allege[d] false statement is necessary to [the] finding of probable cause, [the] Fourth Amendment requires that [a] hearing be held at defendant's request.

*Id*. at 155-56. This evidentiary hearing was subsequently coined a "*Franks* hearing."

In denying appellant's motion to suppress, the court further concluded:

> THE COURT: I believe that Mr. Hall spoke to [Officer Etwaroo], and that [he] used that information in his application for the warrant. So, I think that our — the *Franks* doesn't apply here, because I don't think that Mr. Hall's information given to [Officer Etwaroo] needs to be excised from that warrant.
>
> * * *
>
> THE COURT: So, combining that with what I found to be Mr. Hall's kind of incredible recanting of what is in the warrant, I'm denying [appellant's] motions [ ] — to suppress in this case.

We remain cognizant of this Court's role in reviewing the determinations of an issuing judge's decision to issue a search warrant, and the deference afforded to same. *See Carter*, 178 Md. App. at 409 ("[An] after-the-fact scrutiny by an appellate court regarding the sufficiency of an affidavit should not take the form of *de novo* review. A[n] [issuing judge's] 'determination of probable cause should be paid great deference by reviewing courts.'"). Thus, we reject appellant's attempt to "revive" his arguments regarding the alleged inconsistencies or omissions in the affidavit, which were appropriately considered and rejected by the circuit court.

We also reject appellant's argument that "the affidavit is written to lead one to believe there is only one confidential source; however, [Officer] Etwaroo testified that there were, in fact, two confidential sources." Appellant failed to demonstrate how this fact negated the credibility of the informants or the judge's finding of probable cause.

We conclude that a practical, common-sense approach in light of the totality of the circumstances, supports the issuing judge's determination that probable cause existed. In addition to the truthful and reliable information supplied by the informants, coupled with

- 15 -

police investigation, which later corroborated with the information supplied by the informant, Officer Etwaroo also observed suspicious behavior prior to receiving a positive alert from the K-9 dog.

> The affidavit indicated:
>
> Your affiant followed this vehicle to an apartment complex located on Queensbridge Court in Cockeysville, MD. The vehicle parked and a black male exited the vehicle. Your affiant was able to positively identify this individual as [appellant]. When [appellant] exited the Mercedes, he looked around for approximately [twenty] seconds before going back into his vehicle and then exiting with a black bag. [Appellant] then walked [into] the apartment building at 10 Queensbridge Court and ascended the stairs.
>
> Your affiant then watched from a covert location 10 Queensbridge Court, monitoring the traffic flow into the apartment building, to see if [appellant] would exit apartment K with the heroin that [informant # 2] stated [appellant] would be supplying in Baltimore City. As of 2300 hours [appellant] has not emerged from apartment K. During the time your affiant was observing [appellant's] apartment, your affiant observed two [black males] enter the apartment building and enter apartment K, which is located on the third floor of the apartment building and enter same. Your affiant observed the two male[s] then leave after only visiting for a few minutes. Your affiant believes that this behavior is indicative of narcotics trafficking. Your affiant did not want to stop the two males that exited [appellant's] apartment to protect the integrity of this investigation.

Regarding a discussion concerning suspicious behavior, the opinion of *Bailey v. State*, 412 Md. 349, 382 (2010), is instructive:

> [I]t is 'impossible for wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.' The [lawful behaviors displayed during surveillance of appellant are] [ ] innocent factor[s] without context, but the totality of the circumstances may lead to a conclusion that the lawful [behaviors are] associated with a criminal purpose. *[C]ontext matters: actions that may appear innocuous at a certain time or in a certain place might very well serve as a harbinger of criminal activity under different circumstances.* In the cases in which courts held that . . . lawful [activity] constituted probable cause for a belief that contraband

or criminal activity were present, the surrounding circumstances strongly suggested that [it] was associated with criminal activity.

(internal citations omitted).

Thus, the behavior observed by Officer Etwaroo, considered together with the evidence of record, further supports the conclusion that there was a sufficient basis for the judge to find probable cause.

Appellant further contends that in "[e]xcising the illegally obtained [K-9] dog alert, the warrant is unsupported by probable cause." Specifically, "[g]iven the insufficiency of the remaining information . . . there was an insufficient basis to find probable cause to issue a search warrant . . . and the evidence must be suppressed." Alternatively, appellant asserts, "[e]ven if the information from the claimed dog alert is included, the affidavit still does not provide a sufficient basis for probable cause as the state failed, . . . to establish the reliability of the dog." We disagree.

Because we concluded, *infra*, that the area outside of appellant's apartment door was not curtilage and that appellant did not have a reasonable expectation of privacy therein, appellant's argument that the K-9 alert was illegally obtained evidence that must be excised from the affidavit, fails. We further conclude that appellant's argument regarding the reliability of the K-9 dog was not preserved on appeal. Therefore, we decline to address that argument. Under the totality of the circumstances, the affidavit afforded the warrant-issuing judge with a substantial basis to find probable cause that appellant's apartment contained illegal drugs, without consideration of the K-9 alert.

Accordingly, we need not consider whether the Fourth Amendment exclusionary rule barring the admission of illegally obtained evidence applies. However, assuming otherwise, the exclusionary rule would still not apply because Officer Etwaroo reasonably relied on the affidavit in good faith. We look to the Court of Appeals' opinion in *Patterson v. State*, 401 Md. 76 (2007), for guidance. In *Patterson*, the Court of Appeals outlined the four limitations to the good faith exception:

> (1) the [judge] was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless regard for the truth; (2) the [judge] wholly abandoned his detached and neutral judicial role; (3) the warrant was based on an affidavit that was so lacking in probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonable presume it to be valid.

*Id*. at 104 (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)). However, none of these circumstances are present in the case at bar. The record is devoid of any evidence demonstrating that the warrant-issuing judge was misled[6] by information contained in the affidavit that Officer Etwaroo knew or would have known was false, apart from the officer's reckless regard for the truth. The record is also devoid of any evidence indicating that the warrant-issuing judge abandoned his detached and neutral judicial role in issuing the warrant or that the warrant was facially deficient.

---

[6] Although the circuit court acknowledged the alleged deficiencies in Officer Etwaroo's affidavit during the motions hearing, it nonetheless determined that they were not fatal to his warrant application. We acknowledge, as appellant counters in his reply brief that "[a] *Franks* hearing is not a prerequisite to arguing that the good faith doctrine" applies. However, we reject this argument because contrary to appellant's contention, Officer Etwaroo did not "carelessly, recklessly, and dishonestly" prepare the affidavit.

Under the third exception, the exclusionary rule would not apply because the evidence demonstrates that Officer Etwaroo reasonably relied on the warrant in good faith. S*ee generally, Leon*, 468 U.S. 897 (1984). In *Patterson*, 401 Md. at 106-07, the Court held:

> This exception under [*United States v. Leon*, 468 U.S. 897] requires the application of an objective test of a police officer's good faith reliance on the search warrant. The objective test requires that officers, exercising professional judgment, could have reasonably believed that the averments of their affidavit related to a present and continuing violation of law, not remote from the date of their affidavit, and that the evidence sought would be likely found at [the place identified in the affidavit]. The affidavit cannot be so 'bare bones' in nature as to suggest that the issuing judge acted as a 'rubber stamp' in approving the application for the warrant.

(internal citation and citation omitted).

An affidavit is considered bare bones when it lacks "indicia of probable cause as to render official belief in its existence entirely unreasonable," or "contains wholly conclusory statements [ ] lack[ing] the facts and circumstances from which a [judge] can independently determine probable cause." *See Patterson*, 401 Md. at 107 (quoting *Leon*, 468 U.S. at 923; *United States v. Laury*, 985 F.2d 1293, 1311 n. 23 (5th Cir. 1993).

These deficiencies are not present in Officer Etwaroo's affidavit. As we determined, *supra*, the affidavit contained several objective facts from which a judge could reasonably conclude that there was probable cause to search appellant's apartment. Additionally, the averments in the affidavit were not conclusory and any alleged deficiencies contained in the affidavit was *acknowledged and refuted as immaterial* to the circuit court's determination that probable cause existed. In exercising his professional judgment, Officer Etwaroo reasonably believed that the averments outlined in the affidavit

- 19 -

related to appellant's present and continuing violation of the law and that the evidence sought would likely be found in appellant's apartment. *See generally Patterson*, 401 Md. at 108-10.

## II. *Violation of Appellant's Fourth Amendment Rights*

Appellant contends that the police violated his Fourth Amendment rights by trespassing onto the curtilage of his apartment in order to have a K-9 dog probe the contents of his apartment. We disagree.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. *See generally Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). Accordingly, "[w]hen 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Id*.

Under the Fourth Amendment, "the home is first among equals." *Id*. Thus, "[a]t the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Id*. (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "We therefore regard the area 'immediately surrounding and associated with the home' — what our cases call the curtilage — as 'part of the home itself for Fourth Amendment purposes.'" *Jardines*, 133 S. Ct. at 1414. "[The curtilage] is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'" *Id*. at 1415.

In defining the extent of a home's curtilage, courts look to four factors: 1) "the proximity of the area claimed to be curtilage to the home[;]" 2) "whether the area is included within an enclosure surrounding the home[;]" 3) "the nature of the uses to which the area is put[;]" and 4) "the steps taken by the resident to protect the area from observation by people passing by." *See United States v. Dunn*, 480 U.S. 294, 301 (1987).

Once it is determined that an investigation took place in a constitutionally protected area, such as the curtilage, courts address whether it was accomplished through an unlicensed physical intrusion. "[A]n officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." *Jardines*, 133. S. Ct. at 1415. Accordingly, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id*. at 1416.

Citing the factors enumerated in *Dunn*, 480 U.S. 294, appellant avers:

As noted in the search warrant [a]ffidavit, the canine 'scanned the door to apartment K.' Obviously then, the officer controlling the canine was standing in front of [appellant's] apartment door located on the third floor. Thus, the proximity of the area to the inside of [appellant's] apartment was the width of the door separating the two. . . .

The second and third *Dunn* factors also show that the area immediately outside [appellant's] apartment is curtilage. While generally, the hallway area outside of an apartment door is not 'included within an enclosure surrounding the home, . . . here, those areas, as well as the entire building, are secured by locks and a buzzer system, they are indeed enclosed. And the 'nature of the uses to which the area is put,' also warrants finding that the area is protected by the Fourth Amendment. Often apartment dwellers will keep decorations, bicycles, and shoes outside their apartment door.[ ]

The final factor, the steps taken to protect the area from observation by people passing by, is probably satisfied in a secured multi-unit apartment

- 21 -

building even more so than a single family dwelling where the porch and the yard, . . . are generally open to view. . . . The whole point of the locked door and buzzer system is to keep uninvited visitors away from the apartment units as well as the common areas. . . .

Although the area outside of appellant's door was in close proximity to the apartment, appellant has not demonstrated that the circumstances before us satisfy the factors outlined in *Dunn*. *See Dunn*, 480 U.S. at 302 (stating that the barn's substantial distance located 50 yards from the fence surrounding the house and 60 yards from the house itself, "supports no inference that the barn should be treated as an adjunct of the house.").

Additionally, although the area within the apartment building was equipped with a lock and a buzzer system, it was unclear whether entry into the building was, in fact, "secure." In addressing the propriety of the K-9 dog alert, the circuit court stated:

> As both sides have acknowledged, no one knows how anyone got into that building, with the dog or the Officer. The door could have been propped open. . . . They knew that they didn't have the right to exclusive possession of that hallway, so I do think the K-9 sniff further bolsters the warrant, and further lends credibility to it.

These facts are fatal to appellant's argument that the area outside of his apartment door was enclosed.[7] *See Dunn*, 480 U.S. at 302 (holding that "it is also significant that respondent's barn did not lie within the area surrounding the house that was enclosed by a fence[,]"

---

[7] Similar to the circuit court's conclusion, we also note that it is unclear from the record how the detectives gained entry into appellant's building that evening, or whether the main entry door of the building was locked or unlocked. Officer Etwaroo's testimony during the motions hearing reveals only that at the time of the detectives' entry and subsequent K-9 dog alert, he was offsite obtaining the search warrant and unsure of how they gained entry into the building.

which plainly demarked the area that is part of the house, but also "a distinct and separate portion of the ranch."). *See also Oliver v. U.S.*, 466 U.S. 170, 182, n. 12 (1984) (concluding that "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage — as the area around the home to which the activity of home life extends — is a familiar one easily understood from our daily experience."). Moreover, assuming the hallways were considered "enclosed" within the building, where tenants and authorized visitors can access only with keys or through the buzzer system, this may only establish that the area was not "private," as appellant alleges.

Appellant's arguments relative to the third and fourth *Dunn* factors are unpersuasive. Both factors suggest that curtilage—where an expectation of privacy is most heightened—is within an area where the individual maintains some form of *exclusive control*. This is contrary to the circumstances in the case at bar because common areas, such as the hallways of a multi-unit apartment building, are generally not areas in which a tenant is deemed to have "exclusive control." *See generally Dunn*, 480 U.S. at 302-03 (noting that respondent was the owner of the barn, which was within his exclusive control). *See Grymes v. State*, 202 Md. App. 70, 94-95 (2011) (noting the consensus amongst federal circuit court cases in support of our holding that tenants of multi-unit apartment buildings do not have a legitimate expectation of privacy in the common hallways and areas of the buildings due to lack of exclusive possession therein). *See also* Carol A. Chase, *Cops, Canines, and Curtilage: What Jardines Teaches and What It Leaves Unanswered*, 52 Hous. L. Rev. 1289, 1304 (2015) (noting that a tenant's "dwelling" within a multi-unit apartment

building does not extend beyond the apartment and areas subject to the tenant's exclusive control).

Assuming, *arguendo*, that the area outside of appellant's apartment door was within his exclusive control, his arguments under the third and fourth *Dunn* factors would still fail. Relative to the third factor, appellant asserts that because apartment dwellers store items such as "decorations, bicycles, and shoes" outside of their apartment door, the area is curtilage. However, this argument is unpersuasive. The fact that these items are stored within those "outside" areas strongly suggests that they were not being used for intimate activities within one's home. *See Dunn*, 480 U.S. at 302-03.

We also reject appellant's final contention that the existence of a lock and buzzer system in the apartment building indicates that steps were taken to protect the area from observation by passerbys. In contrast, appellant's own testimony revealed that the area was observable by a passerby and thus, the lock and buzzer system functioned as a security mechanism, rather than one ensuring privacy. *See* Dunn, 480 U.S. at 303 (holding that "[n]othing in the record suggests that the various interior fences on respondent's property had any function other than that of the typical ranch fence; the fences were designed and constructed to corral livestock, not to prevent persons from observing what lay inside the enclosed areas."). Thus, we agree with the State's conclusion that "[c]onsidering the [K-9] dog-sniff [alert] only fortifies the conclusion that the affidavit afforded the warrant-

issuing judge a substantial basis to find probable cause[]" because appellant failed to demonstrate that the K-9 dog alert occurred within the curtilage of his home.[8]

Moreover, because the area outside of appellant's door was within a common area, he did not have a reasonable expectation of privacy in the same. *See Grymes*, *supra*. Courts tasked with resolving the issue before us have historically held that tenants of a multi-unit dwelling do not have a reasonable expectation of privacy in the common areas therein. *See* Chase, *Cops, Canines, and Curtilage: What Jardines Teaches and What It Leaves Unanswered*, *supra*, at 1309 (explaining that the great weight of authority of federal appellate courts from nine circuits maintain that a tenant of a multi-unit dwelling does not have an expectation of privacy in common areas of that dwelling).

Thus, appellant's reliance on *McDonald v. United States*, 335 U.S. 451 (1948) and its progeny in support of his argument, is misplaced. Although the Court held that the officers violated McDonald's Fourth Amendment rights by climbing through the landlord's room and then peering into a transom above McDonald's apartment door within a common hallway, the Court's holding was predicated on the existence of an unlawful breaking and entering. *Id*. at 453-56. Justice Jackson elaborated on this threshold finding in his concurring opinion, in which he stated, "[b]ut it seems to me that each tenant of a building, *while he has no right to exclude from the common hallways those who enter lawfully*, does

---

[8] Since we conclude that the area outside of appellant's apartment door was not curtilage, and thus not in a constitutionally protected area, we decline to address appellant's argument that the police investigation was accomplished through an unlicensed physical intrusion. *See Jardines*, *supra* (outlining the standard of review that is followed once it is determined that a police investigation took place in a constitutionally protected area).

have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry." *Id*. at 458 (emphasis added).

Unlike *McDonald*, the evidence in the instant case does not demonstrate that the detectives gained entry through an unlawful breaking and entering, because it is unknown whether the main door to the apartment building was locked at the time of their entry. This severely undermines appellant's remaining contentions relative to his reasonable expectation of privacy in the area outside of his apartment door. Accordingly, we decline to address appellant's further arguments.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**